El Pueblo de Puerto Rico, demandante y apelado, *v.* Emilio Nieves, acusado y apelante.

No. 3784—*Sometido:* Junio 6, 1929. *Resuelto:* Diciembre 24, 1929.

*E. Martínez Avilés,* abogado del apelante; *R. A. Gómez,* abogado de *El Pueblo,* apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

La acusación, en lo pertinente, dice: ''El referido acusado, Emilio Nieves, el 5 de octubre de 1928 y en el barrio de Arrozal de Arecibo, . . . ilegal, voluntaria, maliciosa y criminalmente, con motivo de una súbita pendencia o arrebato de cólera, acometió y agredió con un machete, que es un arma mortífera, y con intención de dar muerte a Otilio Roig, (ser humano) infiriéndole varias heridas graves que le ocasionaron la muerte al día siguiente.''

Alegó el acusado su inocencia, fué la causa a juicio y el jurado rindió un veredicto de culpabilidad. La corte, el 21 de diciembre de 1928, dictó sentencia condenando a Nieves a sufrir cuatro años de presidio con trabajos forzados.

Contra esa sentencia se ha interpuesto el presente recurso de apelación, alegándose que la corte erró: 1°., al no permitir declarar al perito médito presentado por la defensa sobre el tratamiento inadecuado recibido por el herido Otilio Roig; 2°., al no permitir a la defensa presentar otra prueba después de haber permitido a dos jurados, cerrado el caso por el fiscal y la defensa, hacer preguntas al único testigo que había presentado El Pueblo; 3°., al dictar sentencia contra el acusado por ser el veredicto contrario a derecho y a las pruebas; 4°., al no hacer un resumen de la evidencia en sus instrucciones al jurado, y 5°., al imponer al acusado una pena excesiva en relación con las circunstancias en que se cometió el delito.

Como el quinto error no se discute en el alegato, pres-

cindiremos de considerarlo. Además, si se llega a la conclusión de que hubo base para rendir el veredicto que el jurado rindiera en esta causa, es tan claro que no existe la más leve base para considerar excesiva la pena impuesta por la corte al apelante, que se explica perfectamente la conducta de su letrado.

Alterando el orden del señalamiento de errores, comenzaremos por el tercero, o sea el que sostiene que el veredicto es contrario a derecho y a la prueba. Podríamos limitarnos a decir que la prueba fué contradictoria y que habiendo el jurado resuelto el conflicto, su decisión debe prevalecer; pero dadas las circunstancias del caso y el énfasis con que se ha sostenido que la prueba no es suficiente, procederemos a analizarla.

La evidencia aportada por el fiscal consistió en una certificación del registro civil de la que consta que Otilio Roig Quiñones, de treinta y ocho años de edad, casado, natural de Arecibo, blanco, bracero, falleció a las diez y media de la noche del seis de octubre de 1928 "a consecuencia de *shock* hemorrágico secundario o heridas de arma blanca," en el Hospital Municipal de Arecibo.

Las heridas, según el perito médico que declaró en el juicio, fueron: una en la oreja izquierda de carácter leve, otra en la cara, lado izquierdo, bastante profunda, otra en la mano izquierda, región dorsal, que seccionó los tendones de los dedos medio e índice e interesó los huesos, y otra herida extensa en el brazo derecho tan profunda que seccionó el biceps y el braquial. Tenía otras heridas contusas en la espalda. La herida del brazo fué la que produjo la hemorragia que ocasionó la muerte.

Luego del médico declaró un solo testigo más, Rafael Roig, hijo del interfecto, de doce años de edad, que se expresó así:

"Papá salió a la finca y encontró a Emilio cortando una leña en lo de él, y le dijo que no destruyera aquella leña, que la dejara

quieta; y se puso con malas palabras y ahí le desarrajó con la daga, y papá tenía un cantito de machete y no se podía defender con él y se le cayó y lo cogí y eché a correr, porque me iba a caer encima a mí.''

Preguntado y repreguntado insistentemente, se sostuvo en lo dicho.

La defensa para ''probar que este acusado no trató de matar a Roig y lo que hizo fué defenderse para evitar que lo mataran y que si no lo hace hubiera muerto,'' presentó al testigo Alejo Nieves, hermano del acusado. Alejo declaró:

''Yo y Emilio estábamos juntando una hoguera . . . Nosotros estábamos haciendo la hoguera y llegó Otilio Roig y dijo: hijo de la gran puta, esta leña es mía, y dijo Emilio si es tuya cógela, que me voy para casa; y dijo Otilio Roig: no; yo vengo a matarte o a que me mates . . . En seguida cogió el machete y le cayó a tajos . . . Sí, señor; Roig le dió una herida en un brazo a Emilio . . . Antes de Emilio cortarlo . . . Roig después de herido cogió para donde Juan Centeno y Emilio para casa . . . Yo me vine con Emilio.''

El interrogatorio de repreguntas fué, en parte, así:

''P.—Cómo fué, que se defendió?—Escapándole con la daga.— P.—No hizo más que escaparse con la daga?—Reculando para atrás. —P.—Fué todo lo que hizo?—Sí, señor.—P.—No hizo nada más?— Nada más . . . —P.—Y estuvo así siempre y no hizo nada?— Nada . . . P.—No hizo nada?—No, señor.—P.—No lo cortó tampoco?—Si, señor; le dió un tajo en una muñeca, Otilio Roig al otro. —P.—Pero Emilio Nieves al otro?—No le hizo nada.—P.—Estás seguro?—En los primeros tajos no le hizo nada.—P.—Y cuándo le hizo?—Viendo que lo iba a matar Otilio se defendió como mejor pudo.—P.—Cómo fué que se defendió, que es lo que queremos saber? Qué fué lo que hizo para defenderse?—Reculando para atrás y tapándose con la daga, y según tiraba el tajo le metía la daga.—P.— Lo único que hacía era eso?—Sí, señor.''

Declarando como su propio testigo Emilio Nieves, en parte dijo:

''Estando haciendo esa hoguera, en lo de papá, llegó Otilio Roig y me dice: sinvergüenza, hijo de la gran puta, quién te ha dado

ese terreno? y yo contesté: si el terreno es tuyo cógelo y la hoguera, que me voy para casa; y ahí mismo me cayó encima y me defendí y le dije: Otilio, no peleemos que esto no vale nada, y dijo: o me matas o te mato; y volví y dije: no peleemos que esto no vale nada . . . P.—Él le hirió a Ud. antes?—Él me hirió a mí.—P.—Le tiró primero él con el machete?—Sí, señor.—P.—Le hirió?—Sí, señor.—P.—Dónde?—En esta muñeca.—P.—Antes de defenderse Ud.?—Sí, señor.—P.—Tiene alguna cicatriz en esa mano?—Sí, señor.—P.—Muéstrela a los Jurados.—(La muestra).''

Luego, a repreguntas del fiscal, se produjo así:

''P.—Le tiró con el machete?—Sí, señor.—P.—Cómo?—Así.—P.—Y·lo cogió en la mano?—Sí, señor . . . P.—Y le hizo esa cicatriz nada más?—Sí, señor.—P.—No le tumbó el brazo?—No, señor; no me tumbó el brazo porque tenía un gabán y una camisa y partió el gabán y la camisa.—P.—No le hizo más que eso?—Eso.—P.—No le dió otra herida?—R.—No, señor; me defendí como mejor pude.''

Tal fué la evidencia. Es cierto que el único testigo presencial de cargo era un testigo interesado. También lo era el presentado por el acusado. El primero era hijo del interfecto, el segundo hermano del acusado.

El resultado de la lucha corrobora la declaración del testigo de cargo. El número, el sitio y la gravedad de las heridas que Nieves infirió a Roig comparado con la cicatriz de la única que según Nieves le infiriera Roig, cicatriz que mostró al jurado sólo dos meses y doce días después de inferida la herida, inclinan el juicio a favor de la teoría del fiscal.

La prueba es suficiente para demostrar el delito y la culpabilidad del acusado. No se cometió, por tanto, el tercero de los errores señalados.

Por el primer error se levanta una cuestión que fué ya objeto de estudio y decisión por esta corte en otro caso procedente de la Corte de Distrito de Arecibo: *El Pueblo* v. *Juan Rodríguez*, (39 D. P. R. 929) por homicidio voluntario, donde se dijo:

''En apelación se nos llama la atención hacia el hecho de que el

interfecto tal vez no hubiese muerto de haber recibido la debida atención médica. En otras palabras, se insiste en que Albarrán no hubiese muerto si hubiera recibido el tratamiento médico adecuado. Podría surgir la duda de si un golpe como el inferido en el presente caso ordinariamente hubiera producido la muerte. Sin embargo, la muerte fué la consecuencia natural del golpe inferido en este caso. Ninguna otra causa intervino. El dejar de obtener tratamiento médico adecuado no es tal causa intermediaria.

"La jurisprudencia es clara y ha sido durante siglos que si se infiere un golpe que no es necesariamente mortal y sin embargo la víctima muere, el agresor, siempre que concurran los otros elementos necesarios del delito, puede ser condenado por la muerte de tal persona. El caso de Rew, J. Kelying, 26 English Reprint, tomo 84, p. 1.066, El Pueblo v. Lewis, 124 Cal. 551, 13 R.C.L. 751, párrafo 57, y casos citados; nota 22, L.R.A. (N.S.) 841 y otras citas contenidas en el alegato del fiscal."

Si ello es así, claro está que la corte sentenciadora no erró "al no permitir declarar al perito médico presentado por la defensa, sobre el tratamiento inadecuado recibido por el herido Otilio Roig".

Parece conveniente citar lo resuelto por las Cortes Supremas de Iowa y Montana en los siguientes casos:

"En un proceso por asesinato no es error rehusar permitir al abogado defensor penetrar en la cuestión de si alguna forma especial de operación quirúrgica podría haber salvado la vida al interfecto, no habiéndose demostrado que alguna otra causa que no fueran los actos del acusado fuera la causa de la muerte." State v. Seery, 105 N. W. 511.

"En un proceso por homicidio cuando se demuestra que la muerte siguió a la herida sin que interviniera ninguna otra causa independiente calculada para producir la muerte a no ser la lesión ilegal producida por el acusado, toda evidencia para demostrar falta de adecuado tratamiento al interfecto después de la herida y antes de la muerte, debe ser excluída." State v. Pell, 119 N. W. 154.

"En un proceso por homicidio donde el acusado alegaba que la muerte había resultado por tratamiento inadecuado, y no por la herida, una pregunta dirigida al médico que trató al interfecto acerca de que si el interfecto hubiera recibido pronto y adecuado tratamiento quirúrgico él hubiera muerto en tan pocas horas, no tendía

a demostrar que la herida fuera mortal por necesidad, fué propiamente excluída." State v. Halk, 141 Pac. 149.

Y se concibe lógicamente que así sea, ya que toda persona debe ser responsable de las consecuencias naturales de sus actos.

No quiere ello decir que cuando una persona a quien se infiere una herida muere después, dentro de un año y un día (art. 205 del Código Penal), no pueda demostrarse que la muerte se debió a otra causa independiente de la herida. En tal caso la muerte no sería la consecuencia natural de la herida sino la de la otra causa independiente, y no existiría delito alguno.

Pero cuando la muerte es consecuencia natural de la herida, la cuestión del tratamiento de ésta en nada influye en la calificación del delito. Y que la muerte fué aquí la consecuencia natural de la herida, lo demuestra la propia declaración del perito a quien después de todo y tras el largo debate que se suscitara en el juicio, se le permitió que declarara, así:

"A preguntas del Abogado Sr. Martínez Avilés, declaró: P.—Dr. Ud. podría decir la causa o motivo por el cual murió o falleció ese hombre, Otilio Roig?—El individuo, cuando lo trajeron al hospital, según dije anteriormente había perdido una cantidad enorme de sangre debido a que las ligaduras que le habían puesto no eran eficientes, no eran bien apretadas y continuaba sangrando hasta que lo trajeron al hospital y se le prestaron los auxilios necesarios y estaba en un estado de shock profundo, debido a la hemorragia sufrida, y ella fué la causa directa de la muerte, el shock producido por la hemorragia.—P.—Fué el shock?—Sí, señor; el shock producido por la hemorragia.—P.—Dijo antes que esas heridas no eran ninguna de ellas mortal por necesidad?—Ninguna de ellas."

■■ Los errores segundo y cuarto relativos a no haberse permitido a la defensa presentar nueva prueba después de permitir, cerrado el caso, a dos jurados que interrogaran al testigo del fiscal, y a no haber resumido el juez la evidencia en sus instrucciones al jurado, carecen de importancia.

Sucedió que una vez que terminó la prueba de la defensa, uno de los jurados preguntó a la corte si le sería posible hacer algunas preguntas al testigo Rafael Roig. Contestó afirmativamente la corte. Fué llamado el testigo e interrogado sobre los mismos extremos de su anterior declaración. Entonces ocurrió lo que sigue:

"Abogado Sr. Martínez Avilés. Ahora que se ha abierto el caso solicito de la Corte que se me permita preguntar a otro testigo de la defensa.—Hon. Fiscal. Me opongo a que el caso se abra de nuevo. —Abogado Sr. Martínez Avilés. Es discrecional de la Corte. Pudo denegar la petición del jurado, y también es discrecional que esta defensa haga la pregunta a un testigo. (Ambos letrados argumentaron).—Hon. Juez. Sostenida la oposición del Fiscal.—Abogado Sr. Martínez Avilés. Tomo excepción."

La propia defensa sostuvo en el acto mismo que la corte tenía discreción sobre la materia y no podemos percibir abuso alguno de discreción.

Hemos leído las instrucciones y si bien el juez no entra en detalles sobre la evidencia practicada a ella se refiere clara y distintamente. Se trataba de muy pocos testigos y sus declaraciones estaban frescas en las mentes de los jurados ya que la evidencia se practicó y el veredicto se rindió en un solo día.

Las instrucciones son claras y precisas y el acusado por su abogado se limitó a decir cuando el juez terminó de trasmitirlas: "Tomamos excepción a las instrucciones dadas." No se especificó ningún particular que a su juicio fuera erróneo o deficiente.

*Debe confirmarse la sentencia recurrida.*