El Pueblo de Puerto Rico, demandante y apelado, *v.* Charles Tilo, *alias* Franmachú, acusado y apelante.

Núm. 11725.—*Sometido:* Junio 3, 1947. *Resuelto:* Junio 24, 1947.

*Vicente Palés Matos*, abogado del apelante; *Hon. Procurador General Luis Negrón Fernández y Joaquín Correa Suárez, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

En la noche del 6 de enero de 1945 Oscar Cintrón se hallaba en un *bar* que poseía el acusado en Mayagüez. Cintrón había puesto a funcionar la vellonera que había en el establecimiento, en momentos en que el acusado suministraba cierta información al policía David Jiménez, relacionada con una investigación que éste practicaba. Como el ruido que producía la vellonera molestaba al acusado y al policía, Cintrón fué requerido por ellos para que no tocase la vellonera. Manifestó éste al acusado que tendría que devolverle los diez centavos que había echado en la vellonera y aquél le dió entonces una peseta. Esta actitud del acusado no bastó para aquietar a Cintrón, quien se subió a una mesa y empezó a molestarlo, dando lugar a una discusión entre ellos. Llegó un momento

en que Cintrón bajó de la mesa y le dió una bofetada al acusado. Inmediatamente se trabó una lucha cuerpo a cuerpo entre ellos. Antes de que el policía pudiese intervenir, el acusado, quien portaba un revólver oculto entre sus ropas, hizo un disparo, como resultado del cual Cintrón recibió una herida en la región parietal derecha, cayendo al suelo. El acusado inmediatamente entregó el arma al policía. El herido fué conducido al hospital donde lo asistió el Dr. Arrarás hasta su fallecimiento el 2 de febrero siguiente.

El Dr. Arrarás practicó la autopsia y aseguró que la muerte había ocurrido a consecuencia de una meningitis producida por la irritación que causó en la masa encefálica la compresión que le hacía el hueso fracturado. Declaró que la herida no era mortal por necesidad; que al observar en el paciente síntomas de meningitis y luego de consultar con otro médico, aconsejó a Cintrón, quien estaba en su conocimiento, que para evitar la compresión precisaba operarlo y le advirtió que era la única oportunidad de salvarle la vida, contestando el paciente que él prefería morirse a someterse a la operación.

La única variación sustancial entre la evidencia del fiscal y la del apelante consiste en que, según la de éste, al irse a las manos el interfecto y el acusado, el primero agarró el revólver que portaba el segundo y en la lucha del uno por apoderarse del arma y el otro por impedirlo, salió el tiro.

El jurado dirimió el conflicto de la prueba en contra del acusado trayendo un veredicto de homicidio voluntario, pero recomendó clemencia en la imposición de la pena. Oportunamente el acusado solicitó un nuevo juicio y siéndole denegado se dictó sentencia de dos años de presidio con trabajos forzados. Contra la sentencia y contra la negativa a conceder el nuevo juicio se interpuso el presente recurso.

El primero de los errores señalados consiste en haberse negado la corte a instruir al jurado que trajera un veredicto de absolución perentoria. Este señalamiento de

error está predicado en que no siendo la herida mortal por necesidad y habiendo el herido rehusado operarse, la causa de la muerte no puede imputarse a la herida, sino a la enfermedad que sobrevino por no haberse llevado a cabo la operación.

La cuestión planteada por la defensa nos conduce a determinar si el haber rehusado el herido someterse a la operación releva al acusado de responsabilidad por el delito imputádole. El principio legal envuelto en este caso no es nuevo en esta jurisdicción. En los casos de *Pueblo v. Rodríguez,* 39 D.P.R. 929 y *Pueblo v. Nieves,* 40 D.P.R. 384, en que los acusados fueron convictos de homicidio, se resolvió que cuando la muerte sigue a la herida sin que intervenga otra causa independiente calculada para producir la muerte a no ser la lesión ilegalmente producida por el acusado, toda evidencia ofrecida para demostrar falta de adecuado tratamiento al interfecto, debe ser excluída.

Esta jurisprudencia bastaría para despachar el señalamiento de error que nos ocupa; pero posteriormente, en el caso de *Pueblo v. Pérez,* 61 D.P.R. 470, a pesar de citarse con aprobación los dos casos anteriores, se consignó un *obiter dictum,* que hace incierta la posición de este Tribunal sobre esta materia y para desvanecer la duda, es imperativo dar a la cuestión alguna consideración adicional. En el caso de *Pérez,* supra, el apelante fué sentenciado por un delito de mutilación consistente en haber agredido a Asunción Morales con un foete, infiriéndole un golpe sobre el ojo izquierdo, como consecuencia de lo cual el agredido quedó privado de la visión del ojo. El único error que se señaló consistió en haberse transmitido una instrucción, en la cual se decía, entre otras cosas, ''que si una persona le da una herida a otra y esa persona herida no recibe el tratamiento médico adecuado o no se somete al tratamiento médico adecuado, eso no exime de responsabilidad criminal al que infirió la herida.''

Este Tribunal, después de decidir que ''no estamos en condiciones para poder resolver si la instrucción es correcta

o errónea, por no conocer la prueba que desfiló ante la corte y que necesariamente hubo de servir a ésta de base para formular sus instrucciones," posteriormente, en el curso de la opinión, dijo:

"Si el acusado presentó evidencia tendiente a demostrar que la causa sola y próxima de la pérdida de la visión del ojo izquierdo, sufrida por Morales, fué la negativa o resistencia de éste a someterse a un tratamiento médico, en ese caso tendríamos que resolver que la instrucción fué perjudicial a los derechos del acusado, pues si ese testimonio fué presentado y el jurado le dió crédito, el acusado pudo ser declarado culpable de acometimiento y agresión grave y no de mutilación."

La negativa o resistencia a someterse a tratamiento médico no pudo ser la sola y próxima causa de la pérdida de la visión. Esto es así porque si el acto ilegal del acusado fué lo que requirió el tratamiento, ésa fué la causa mediata y la falta del mismo la causa inmediata de la pérdida de la visión. En otras palabras, la falta de tratamiento médico nunca puede ser la sola causa próxima, cuando lo que da motivo al mismo es la lesión, que de no haberse inferido, no hubiera habido necesidad de tal tratamiento. La lesión ilegalmente inferida por el acusado fué en todo tiempo un factor que contribuyó a la pérdida de la visión y por esa razón el acusado era responsable en aquel caso del delito de mutilación, a pesar de que el lesionado hubiera rehusado someterse a un tratamiento médico. Focht, Jr., *Proximate Cause in Homicide*, (1938) 12 So. Calf. L. Rev. 17, 35; *State* v. *Brinkley*, 193 S. W.2d 49 (Mo. 1946); *Tucker* v. *Commonwealth*, 199 S. W.2d 631 (Ky. 1947).

La cuestión suscitada por el apelante, hace muchos años viene ocupando la atención de los tribunales y de los tratadistas de Derecho Penal. *Kelley* v. *The State*, 53 Ind. 311 (1876); *Causal Relation Between Defendant's Unlawful Act and the Death*, (1933) 31 Mich. L. Rev. 659; Clark & Marshall, *Law of Crimes*, (2d. ed. 1905) 322; 1 Wharton, *Criminal Law*, (12a. ed. 1935) 265, nota 19; *Notes* (1908) 22 L.R.A. (N. S.)

841–845.([1])   En Inglaterra existe una larga serie de casos que tratan de esta materia y todos los que hemos encontrado([2]) invariablemente sostienen que si la herida inferida es una causa próxima de la muerte, el hecho de que el herido rehusare o fuere negligente en procurar su curación, no exime al acusado de responsabilidad por el delito.   Entre los casos ingleses se halla el de *Reg* v. *Holland*, (1843) 2 Moody & R., (Engl.) 357, que aparece extractado en una nota en 1 Wharton *Criminal Law*, supra, pág. 265, en los siguientes términos:

" . . . . El occiso había sido severamente herido con un instrumento de hierro en uno de sus dedos y había rehusado que se lo amputaran y quince días después le sobrevino tétano y el dedo fué entonces amputado, pero ya era tarde y el tétano finalmente le produjo la muerte.   El cirujano expresó la opinión que una amputación antes de la fecha en que se le hizo le hubiera salvado la vida.   El juez Maule resolvió que el que infiere una herida que finalmente causa la muerte, es culpable de asesinato aunque se le hubiera podido salvar la vida si el interfecto no hubiera rehusado el remedio."

La razón de la regla la expone la Corte Suprema de Massachussetts, por voz del Juez Presidente Bigelow, en *Commonwealth* v. *Hackett*, 84 Mass. 136 (1861):

"Una doctrina distinta tendería a dar inmunidad al crimen y a privar a la vida humana de una protección saludable y esencial. Entre las contradictorias teorías de los médicos y la incertidumbre natural en el tratamiento de enfermedades y lesiones, sería fácil en muchos casos de homicidio hacer surgir una duda en cuanto a la causa inmediata de la muerte, y de ese modo abrir una ancha brecha por la cual las personas culpables de los más graves crímenes podrían escapar de convicción y castigo."

No existiendo el primero de los errores señalados, pasemos a considerar el segundo.   Éste consiste en haberse denegado la solicitud de *mistrial* presentada por la defensa. La solicitud de mistrial se basó en que uno de los señores del

([1])El Fiscal invoca un caso de Tejas en su alegato, al cual no hacemos referencia porque, si bien aplica la misma doctrina, está basado en un estatuto de dicho Estado y no en los principios generales de la Ley Común.

([2])Mikell, *Cases on Criminal Law* (3ra. ed. 1933), 144 *et seq.*

Jurado, Pablo Ramos, no oía bien y por consiguiente estaba incapacitado para servir como tal. La defensa, a pesar de haber examinado al jurado Sr. Ramos en cuanto a su capacidad para servir como tal, no lo recusó ni motivada ni perentoriamente, como pudo haberlo hecho si en efecto entendía que estaba físicamente incapacitado.(³) En distintas ocasiones durante el curso del juicio, el abogado defensor le preguntó si oía bien y el Jurado siempre contestó afirmativamente, sin que de sus respuestas pudiese advertirse defecto alguno de audición. Es verdad que cuando el acusado ocupó la silla testifical y dijo llamarse "Charles Tilo, conocido por Fernando Franmachú," el abogado defensor, dirigiéndose al Jurado en cuestión, le preguntó: "¿Usted oye bien, don Pablo?" Y el Jurado le contestó: "Sí, Feliú." El hecho de que el señor Jurado no entendiese bien el apodo del acusado no demuestra que fuera sordo. En la conversación corriente a veces no se capta una palabra, especialmente los nombres, y se pide su repetición. Por ese solo hecho no hemos de pensar que la persona que no oyó es sorda. Además, el abogado defensor lo examinó sobre su capacidad para servir como jurado. Desde ese momento sospechó que él no oía bien. Sin embargo, no lo recusó entonces, motivada ni perentoriamente, ni tuvo a bien presentar la moción sobre mistrial, sino hasta después que se había practicado toda la prueba, inclusive la de refutación.

---

(³)En el interrogatorio hecho por la defensa a este Jurado para probar su capacidad para servir como tal, aparece lo siguiente:

"P.—¿Ud. se llama? R.—Pablo Ramos. P.—¿Qué edad tiene? R.—Bueno, tengo sesenta y nueve años. P.—¿Sesenta y nueve, don Pablo? ¿No oye bien? R.—Yo sí. P.—¿Por qué para contestar usted hace un gesto como si no oyera bien? La cuestión es si usted oye bien. R.—Sí, oigo bien. P.—¿Ud. tiene el oído bien? R.—Bueno a momentos siento que se me tapa. P.—Eso debe ser cerilla. Pero ordinariamente ¿oye bien como usted y yo estamos hablando, Don Pablo? R.—Sí, señor. P.—¿De dónde es usted, Don Pablo? R.—De Montoso. P.—¿De allá de Maricao? R.—No, de aquí de Mayagüez. P.—¿Entonces no colinda con Maricao? R.—No. Montoso de Mayagüez. Hay Montoso de Maricao y Montoso de Mayagüez. Eso es de Mayagüez."

No erró la corte sentenciadora al denegar la solicitud de mistrial presentada por la defensa.

 El tercero y cuarto señalamientos de error se refieren, respectivamente, a la negativa de conceder un nuevo juicio y a que el veredicto es contrario a la prueba. La moción de nuevo juicio se fundó en los dos primeros errores que acabamos de discutir. Y en lo que respecta a que el veredicto es contrario a la prueba, ya hemos dicho que ésta fué contradictoria y que el jurado dirimió el conflicto en contra del acusado, y no aparece que al así hacerlo hubiera actuado movido por pasión, prejuicio o parcialidad o incurriera en error manifiesto en la apreciación de la prueba.

*Procede la confirmación de la sentencia.*