RAMÓN MERCED y CRUZ HERNÁNDEZ, ETC., demandantes y recurridos, *v.* GOBIERNO DE LA CAPITAL DE PUERTO RICO y MARYLAND CASUALTY CO., DR. ANÍBAL LUGO y DR. RAÚL SALDAÑA SNIER, demandados y recurrentes los dos primeros.

*Número:* 299  *Resuelto:* 28 de mayo de 1962

---

*F. Fernández Cuyar, Jesús A. González* y *Rafael A. González,* abogados de los recurrentes; *Julio Suárez Garriga* y *Vicente Hita Jr.,* abogados de los recurridos.

Sala integrada por el Juez Presidente Interino Señor Pérez Pimentel y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Resolvimos "revisar la sentencia dictada por el Tribunal Superior, Sala de San Juan ... únicamente en cuanto a la compensación fijada por el tribunal sentenciador". La sentencia recurrida concedió al menor demandante $24,000 "por los daños, perjuicios y sufrimientos físicos y angustias morales" y a los padres del menor $8,000 "por los daños y perjuicios y angustias mentales sufridos". Los recurrentes sostienen que las cantidades concedidas son exageradas.

La causa de acción ejercitada surgió con motivo de un accidente sufrido por Víctor Luis Merced Hernández, mientras jugaba en un parque del Caserío "Extensión Las Casas" en Santurce. Se demandó a la Autoridad Municipal Sobre Hogares de la Capital, entidad a cargo del Caserío "Extensión Las Casas", al Gobierno de la Capital y a los doctores Aníbal Lugo y Raúl Saldaña Snier, empleados estos últimos del gobierno municipal, por la alegada impericia y falta de cuidado y circunspección en el tratamiento de la fractura del brazo sufrida por Víctor Luis.

El demandante "subió a la 'chorrera' para deslizarse por ella, en el tubo del pasamanos que tenía uno de sus extremos desprendidos, perdió el equilibrio y cayó sobre el terreno, ... su brazo izquierdo quedó debajo de su cuerpo. Advirtió que ese brazo se le había roto, y que una astilla de hueso le pro-

yectaba fuera de la piel". Fue ingresado en el Hospital Municipal. El expediente clínico demuestra que "tuvo fracturas compuestas en los tercios medios de los huesos ulna (cúbito) y radio del antebrazo izquierdo con desplazamiento posterior marcado de los fragmentos distales y con resbalamiento".

Transcribimos a continuación en la parte pertinente a la cuestión que estamos considerando, el resumen que hizo el juez de instancia de la declaración del médico que atendió al menor:

"Al examinar a [Víctor Luis Merced] determinó que se trataba de una fractura compuesta y conminuta de los huesos radio y cúbito (ulna) del antebrazo izquierdo en el tercio medio de éste. Ambos huesos quedaron expuestos, al aire, en el lado ventral del antebrazo. Había heridas en la piel y maceración de los músculos y tejidos blandos. Las porciones expuestas de los huesos tenían tierra, y en las cavidades sedulares de éstos había contaminación con la misma tierra que cubría las otras partes óseas.

El brazo estaba completamente deformado, y su extremidad estaba fría y azulosa. Esto era indicio de que la circulación de sangre estaba seriamente afectada.

Se trataba, indudablemente, de una fractura de carácter serio, y el testigo pensó en la posibilidad de ser requerida una amputación inmediata.

. . . . . . . . .

El miércoles 26, por la mañana, el testigo fue llamado a su hogar e informado que el paciente tenía mucho dolor. El doctor A. L. Lugo fue inmediatamente a verlo y procedió a sacarle un drenaje de materia sanguinolenta acumulada por efecto de la destrucción de los músculos y tejidos blandos en el antebrazo. Había una necrosis en músculos y tejidos del brazo.

El paciente sintió inmediatamente mejoría, de tal manera que se quedó dormido mientras era objeto de curación.

. . . . . . . .

El 27 por la mañana el testigo fue llamado de nuevo, mientras se hallaba en el propio hospital, y al ver al paciente encontró que había evidencia, sin duda alguna, de pérdida de circu-

lación en el antebrazo, en parte distal a la fractura. Se generaba toxemia para todo el cuerpo. Concluyó que procedía la amputación. Esto se realizó inmediatamente, con el visto bueno de los parientes del paciente que en el hospital se hallaban presentes. Se hizo por un punto más arriba del codo.

Se trataba de una medida heroica. Había que escoger entre la vida y la muerte del paciente. Así lo entendieron los padres de Víctor Luis, al ser explicados la situación a ellos.

El testigo Dr. Lugo afirmó, en el curso de su atestación de septiembre 18 de 1958, que la amputación del brazo se hizo necesaria por varios factores. Enumera los siguientes:

1. Circulación defectuosa en la extremidad lesionada.
2. Acumulación en ésta de secreciones y sangre.
3. Infecciones secundarias, consecuentes en el área afectada.

Posteriormente el paciente fue visto en varias ocasiones por el Dr. Aníbal L. Lugo, hasta que se le dio de alta, con intención de continuar exámenes en las clínicas de 'pacientes ambulatorios.'

.    .    .    .    .    .    .    .    .

Para conseguirle un brazo artificial adecuado era necesario revisar la amputación por medio de otra operación. Esta fue llevada a cabo en el Hospital Pavía, en el que Víctor Luis Merced ingresó con cargo al Departamento de Salud, en su programa de niños lisiados.

La operación indicada en esa ocasión se realizó satisfactoriamente, y su curso post-operatorio fue sin incidentes."

De la declaración prestada por el Dr. Sabatelle surge que "[e]sta clase de fracturas en que hay desplazamiento de los huesos, causa mucho dolor". En efecto la evidencia demuestra que el demandante sufrió intensos dolores durante los días que precedieron a la amputación del brazo.

Con motivo del accidente y del tratamiento y operaciones posteriores el menor perdió dos años de su curso escolar.

El tribunal de instancia responsabilizó a la Autoridad Sobre Hogares de la Capital, entidad encargada del parque donde ocurrió el accidente. Durante el juicio se desistió de la acción incoada contra el Gobierno de la Capital y los doctores que atendieron al demandante. ¿Es responsable la Au-

toridad Sobre Hogares de la totalidad de los daños sufridos por el menor, o por el contrario su responsabilidad se limita a los daños sufridos con motivo de la fractura, haciendo abstracción de la amputación del brazo y de los sufrimientos que ello causó? ■

En el *Restatement* sobre *Torts*, 2 Torts, A.L.I. § 457 se sugiere que la norma aplicable a la situación que el caso de autos presenta, debe ser la siguiente:

"Si una persona por su negligencia es responsable de los daños causados a otra, dicha persona es también responsable de cualquier otro daño corporal resultante de actos realizados por una tercera persona al suministrarle la ayuda que razonablemente requiera la lesión recibida, independientemente del hecho de que tales actos sean realizados en forma apropiada o negligente."

Y el primer comentario que aparece después de exponer la regla se refiere a los casos como el de autos, en el que la intervención del médico agravó los daños. Se dice al efecto: "En tal caso, la reparación deberá incluir no sólo la cuantía de los daños originalmente causados por la negligencia del demandado, sino también los daños ocasionados por la forma en que los servicios médicos, quirúrgicos o de hospital fueron rendidos, irrespectivamente de si los mismos fueron rendidos en forma equivocada o negligente, siempre que la equivocación o negligencia sea de la clase que se reconoce como uno de los riesgos inherentes a la falibilidad humana de aquellos que prestan tales servicios". Véanse además: *Balancio* v. *United States*, 267 F.2d 135, 137 (2do. cir. 1959); *Jess Edwards Inc.* v. *Goergen*, 256 F.2d 542 (10mo. cir. 1958); *Trieschman* v. *Eaton*, 166 A.2d 892 (Md. 1961); *Bradshaw* v. *Iowa Methodist Hospital*, 101 N. W.2d 167 (Iowa 1960); *Couillard* v. *Charles T. Miller Hospital Inc.*, 92 N.W.2d 96 (Minn. 1958); *Covington* v. *Keal*, 133 S.W.2d 49, Anotación 126 A.L.R. 912 (1939); *Sauter* v. *N.Y. Cent. & H.R.R.R.*, 66 N.Y. 50 (1876); *Lyons* v. *Erie Railway Co.*, 57 N.Y. 489 (1874) y Anotaciones en 8 A.L.R. 506 y 39

A.L.R. 1268; Harper & James, *The Law of Torts*, sec. 20.3, pág. 1124 y compárese con la doctrina prevaleciente en el derecho penal al efecto de que "si se infiere un golpe que no es necesariamente mortal y sin embargo la víctima muere, el agresor, siempre que concurran los otros elementos necesarios del delito, puede ser condenado por la muerte de tal persona". *Pueblo* v. *Rodríguez*, 39 D.P.R. 929 (1929); *Pueblo* v. *Nieves*, 40 D.P.R. 384 (1929); *Pueblo* v. *Tilo*, 67 D.P.R. 496 (1947); *State* v. *Little*, 358 P.2d 120 (Wash. 1961).

Sirve de fundamento a esta regla, la dificultad existente en determinar qué daños provienen de la negligencia original causante del daño y cuáles provienen de la negligencia de los que intervinieron con posterioridad. Prosser *on Torts*, sec. 45, pág. 224 (1955). Además, se apunta la dificultad que entraña establecer adecuadamente un caso de responsabilidad profesional si el agravamiento proviene de negligencia en el tratamiento. Se dice que si la persona que ocasionó el daño originalmente pudiera escapar de responsabilidad alegando la negligencia del médico, el demandante solo tendría entonces una acción de responsabilidad profesional: "una de las más intrincadas y difíciles de sostener en el campo de daños y perjuicios". Para obviar estas dificultades se hace responsable de la totalidad de los daños sufridos al primero. Claro está nada impide que el que ocasionó el daño originalmente recobre del segundo, que por su actuación aumentó los daños. Ver Harper & James, *op. cit.* escolio 13 a la pág. 1124.

*Prosser* en la obra citada expone la razón de la regla así:

"La cuestión no es primordialmente una de relación causal sino de la viabilidad y conveniencia práctica de determinar un daño en distintas partes, cada una de las cuales pueden atribuirse a dos o más causas... Cuando no hay base alguna para hacer la atribución ésta tendrá que ser puramente arbitraria por lo cual no hay otro curso viable que hacer al demandado responsable por la totalidad de los daños."

Esa es la situación en el caso de autos. Es prácticamente imposible determinar si la amputación del brazo se hizo necesaria debido a una deficiente atención médica, o si, por el contrario la naturaleza de la fractura sufrida hacía necesaria la amputación desde el primer momento y el médico hizo un esfuerzo por salvarle el brazo al no practicar la operación en el primer instante.

Así, siendo la Autoridad Sobre Hogares responsable de los daños sufridos por el menor y teniendo en cuenta todo lo que éste padeció, la amputación del brazo, el tener que usar uno artificial durante toda su vida, la pérdida del curso escolar, etc., nos parece que es justa y razonable la compensación concedida, pero la concedida a sus padres resulta excesiva. Debe reducirse a $3,000.

*Se confirmará la sentencia dictada por el Tribunal Superior, Sala de San Juan, con fecha 19 de febrero de 1960, en lo que concierne a la indemnización de $24,000 concedida al menor Víctor Luis Merced, pero se modifica, reduciéndola a $3,000 la compensación concedida a los padres de éste, Ramón Merced y Cruz Hernández.*

El Juez Asociado señor Blanco Lugo concurre en opinión separada.

––––––––––

Opinión concurrente emitida por el JUEZ ASOCIADO SEÑOR BLANCO LUGO.

Únicamente la deferencia que debemos a las determinaciones de hecho del juez de instancia, y el alcance limitado del auto de revisión expedido por este Tribunal, me impelen a concurrir en la confirmación de la sentencia. Sin embargo, no puedo dejar de significar la conclusión que derivé de una lectura cuidadosa de la transcripción de evidencia al efecto de que el accidente, con sus consecuencias ulteriores, ocurrió al caerse el menor demandante de un árbol y no en la forma que declaró probada el tribunal a quo.

Parece siempre oportuno repetir que es muy delicada la misión de apreciar la prueba que corresponde a los tribunales de primera instancia. Consideraciones puramente humanitarias como el hecho de que se trata de un lesionado menor de edad frente a una compañía aseguradora que ha expedido una póliza con límites altos, no deben pesar en el ánimo del juzgador cuando el cuadro de los hechos se inclina decisivamente a sostener la ausencia de responsabilidad civil.