734 F.2d 81
 Patricia HEDDINGER, Plaintiff, Appellee,
v.
ASHFORD MEMORIAL COMMUNITY HOSPITAL and Corporacion Insular
De Seguros, Defendants, Appellants.
Patricia HEDDINGER, Plaintiff, Appellant,
v.
ASHFORD MEMORIAL COMMUNITY HOSPITAL and Corporacion Insular
De Seguros, Defendants, Appellees.
 Nos. 83-1501, 83-1567.
 United States Court of Appeals,
First Circuit.
 Argued Feb. 8, 1984.
Decided May 15, 1984.
 
 Ernesto F. Rodriguez Suris, San Juan, P.R., with whom Miranda Cardenas, De Corral & Rodriguez Suris, San Juan, P.R., was on brief, for Ashford Memorial Community Hosp. and Corporacion Insular de Seguros.
 Wilfredo A. Geigel, San Juan, P.R., for Patricia Heddinger.
 Before CAMPBELL, Chief Judge, WISDOM,* Senior Circuit Judge, and BREYER, Circuit Judge.
 LEVIN H. CAMPBELL, Chief Judge.
 
 
 1
 Patricia Heddinger brought this action in the United States District Court for the District of Puerto Rico against the Ashford Memorial Community Hospital and its insurance carrier, Corporacion Insular de Seguros, for damages based upon the hospital's alleged negligence in delaying the treatment of injuries to her left hand. Jurisdiction was based on diversity of citizenship. Heddinger sought recovery for loss of her left little finger, impairment of her ring finger, lost wages (which were stipulated at $24,000), and physical and mental pain and suffering. Prior to the incident Heddinger was an airline stewardess and, after extensive psychiatric counseling, she has returned to her former job. The jury returned a general verdict in favor of Heddinger for $175,000, and judgment was entered in that amount. Ashford and its insurance carrier appeal, asserting numerous errors. We affirm.
 
 I.
 
 2
 On October 18, 1981, between 10:30 p.m. and 11:00 p.m., Patricia Heddinger was assaulted by Hector Belmonte, an acquaintance, at her apartment in Isla Verde, Puerto Rico. Under the influence of alcohol and perhaps drugs, Belmonte struck Heddinger about the head with a metal rod. She suffered injuries not only to her head but to her left hand, which she had raised to protect herself. After the incident Heddinger repeatedly asked Belmonte to call an ambulance, and he represented to her that he had done so. Finally, being unable to drive herself, Heddinger convinced Belmonte at about 2:00 a.m. to drive her to the hospital.
 
 
 3
 Belmonte drove Heddinger to Ashford, and shortly after she arrived, x-rays were taken of her head and her hand, and her head was stitched up. She asked that her hand be attended to, but the only steps taken were that nurses placed cotton balls soaked in saline solution on her injuries. She was told that her hand would be operated on at 7:00 a.m. In fact, the first doctor to examine her hand did so at approximately one o'clock in the afternoon. He examined the hand and the x-rays and called an orthopedic surgeon, who arrived at 4:00 p.m. Heddinger's hand was operated on at 8:00 p.m. that evening, more than 21 hours after the injury and almost 18 hours after she had been brought to the Ashford emergency room. Heddinger testified to having experienced much physical suffering during the 18-hour delay. She also described experiencing great anxiety and stress from not knowing when she would be attended to and from frustration at being unable to obtain answers from hospital personnel. A psychiatrist who subsequently treated her testified that the stress built up during this period contributed to her later mental problems.
 
 
 4
 After the operation, Heddinger's little finger on her left hand developed dry gangrene and had to be amputated. The amputation was performed at Union Memorial Hospital in Baltimore. There was medical testimony that proper medical procedure would have been to set the finger shortly after arrival at the hospital, and that had such a procedure been followed within six hours of the injury, the finger would not have been lost. There was also some medical testimony, hereafter recounted, concerning adverse effects of the delay upon the healing of Heddinger's left ring finger.
 
 II.
 
 5
 The most substantial argument raised by appellants is that the jury should not have been permitted to consider awarding Heddinger the stipulated sum for lost wages. Appellants assert that Heddinger missed work only because of the "non-union" of her ring finger and related corrective surgery. They go on to contend that there was no evidence to support a finding that the delay in the treatment caused or contributed to the "non-union" of this finger.
 
 
 6
 The following testimony, however, supports a finding that the delay in treatment contributed to the impairment of the ring finger:
 
 
 7
 Q Now, doctor, on the fourth finger, or the ring finger, did the stiffness develop in that joint?
 
 
 8
 A I examined the patient this morning and she has a deformity of the ring finger with stiffness of the medicropal phalangal joint, and some stiffness of the distal joint as well.
 
 
 9
 She is unable to extend the proximal antiformageal joint actively.
 
 
 10
 Q What's that sickness [sic] the result of?
 
 
 11
 A The stiffness is usually a result of adhesion or scarring on the finger that's generally the result of swelling and the long-time effect of swelling and immobilization.
 
 
 12
 Q When you talk about the long effect of swelling and immobilization, is that what you would refer to as delayed treatment in this case?
 
 
 13
 A Well, delayed treatment fairly contributed to the swelling. If a fracture is immobilized properly, an adequate compression handdressing is used, it allows adequate circulation to the fingers. But it does not allow it to swell.
 
 
 14
 Q Did that stiffness require further treatment to eliminate the adhesion?
 
 
 15
 A The patient informs me this morning that she got an adhesion to get the finger moving after the finger finally healed. It took her quite awhile for the finger to heal.
 
 
 16
 Q Doctor, do you have an opinion that the injuries of this patient were treatable and healable if prompt treatment had been given?
 
 
 17
 A Yes, I do.
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 Q Can you please answer, doctor?
 
 
 21
 A Yes, I think that over 99 percent of digits injured in this fashion should successfully heal given national statistics. I think I'm talking about the United States. If you look at a classic manuscript called, "The Complications of Orthopedic Surgery," about two years old, there's about a one to two percent incidence of delayed union in open fractures of the hand. But there's less than one percent incidence of loss of digits.
 
 
 22
 To be sure, on cross-examination the doctor was asked
 
 
 23
 Can you state with any degree of medical certainty whether the delayed union [of the finger] was due more to one factor than the others?
 
 
 24
 Dr. Axtmayer responded, "No." The defendants place great significance on this exchange, arguing that it shows that Heddinger's proof of causation fails. We think the defendants' reliance on this passage is misplaced. Dr. Axtmayer went on to explain that a number of factors can contribute to the non-union of a finger, including the severity of the injury, swelling, the age of the person injured, the presence of infection, and so forth. But he never said that he could not tell whether or not the delay contributed to the ring finger's impairment. His prior testimony remained standing that stiffness is usually traceable to swelling, that the delay fairly contributed to the swelling, and that in approximately 99 percent of cases involving injuries such as Heddinger's the fingers would have successfully healed.
 
 
 25
 That the doctor could not say whether the delay was a more significant factor than some other is not controlling. Heddinger was not required to show that the non-union of the finger was caused solely by the delayed treatment at Ashford, just as she was not required to show that delayed treatment was the sole cause of the loss of the finger. Obviously the assault by Belmonte was a necessary causal factor as to both. There are often several causes, however, which contribute to an injury. See H.M. Brau del Toro, Los Danos y Perjuicios Extracontractuales en Puerto Rico, at 9-2 (1980) (collecting cases). Indeed, the prime example given by Professor Brau involves an accident followed by the negligence of hospital personnel. See also Rodriguez Sosa v. Cerveceria India, Inc., 106 D.P.R. 479 (1977); Merced v. Gobierno de la Capital, 85 D.P.R. 552 (1962). We recognize that Ashford's expert testified that the delay in treatment did not contribute to the impairment of the finger, but the jury was entitled to make up its own mind.
 
 
 26
 Significantly, the authority cited by appellants is not to the contrary. In Medina Vda. de Lopez v. E.L.A., 104 D.P.R. 178 (1975), the question was which of several mutually exclusive possibilities actually caused the injury. In such a case, liability cannot be imposed unless the evidence shows that the doctor's negligence is the most probable of the mutually exclusive alternatives. This is the teaching of Medina. Often, however, there are several factors which together cause injury. This case presents such a situation. The testimony was clear that the delayed and improper treatment of the ring finger contributed to its impairment. While the doctor could not say whether the delay was a more significant factor than others, we do not think this point important so long as it is clear that the delay fairly contributed to the injury suffered by Heddinger. Our view is strengthened by commentary on Medina by Professor H.M. Brau del Toro who said,
 
 
 27
 I consider, however, that it should be sufficient that the actor's conduct presents rational probabilities of having caused or of having contributed to the damage so that the causation element be satisfied.[1]
 
 
 28
 Los Danos y Perjuicios Extracontractuales en Puerto Rico, at 7-41 (1980).
 
 
 29
 Here, the testimony of Dr. Axtmeyer, if credited, would allow the jury to infer that the delay contributed to the impairment of the ring finger. This was sufficient to satisfy the element of causation.
 
 
 30
 Apart from the testimony indicating that the delay in treatment contributed to the impairment of the ring finger, there was also other testimony to support a finding of lost wages. As the district court pointed out, there was a wealth of testimony showing that the amputation of the little finger caused Heddinger great emotional distress for which counseling was required. She was very self-conscious of the loss, particularly because her job as a stewardess required that her hands be constantly exposed to passengers. Further, she was concerned about the comments of her co-workers. Her psychiatrist, Dr. Fiddler, testified that he told Heddinger that returning to work would help her emotional condition, her self-consciousness, and her feeling of hopelessness; in fact, he recommended that she return to work as soon as possible. He said of his role, "I helped her regain enough self confidence to find reemployment." In denying a motion for directed verdict on the issue of lost wages, the district court indicated that the jury could have inferred that Heddinger missed work in large part because she needed time to adjust to her injury, accept it, and get on with her life.
 
 III.
 
 31
 Appellants assert a number of other errors which are entirely without merit. First, they argue that Dr. Carlos Santos and Dr. Manuel Perez Martinez, physicians who attended Heddinger, were not employees of the hospital, and therefore the hospital cannot be held liable for their actions. We need not decide whether the doctors were employees of Ashford or were, as the hospital asserts, independent contractors; in Martinez Gomez v. Chase Manhattan Bank, 108 D.P.R. 515 (1979), the court said,
 
 
 32
 The persons who directly or indirectly hire an independent contractor shall be held jointly liable for the negligent harm caused by the latter in the performance of the work if said harm is a risk foreseeable by the employer.
 
 
 33
 Here, the risk of negligent treatment was clearly foreseeable by the hospital.
 
 
 34
 With regard to the amputation of the little finger, appellants complain that "Doctor Axtmayer did not, repeat, did not state which, if any, of those factors was the one which most probably caused the eventual partial amputation." This argument misses the point. Appellants correctly characterize Dr. Axtmayer's testimony as follows:
 
 
 35
 On cross-examination Dr. Axtmayer testified that three (3) factors contributed to the eventual partial amputation of plaintiff's left 5th finger:
 
 
 36
 a) Alleged delay in treatment;
 
 
 37
 b) Nonalignment of fracture of left 5th finger;
 
 
 38
 c) Trauma received from Mr. Belmonte.
 
 
 39
 As we discussed above with regard to the ring finger, causation is rarely an all-or-nothing affair, with one cause operating to the exclusion of all others. Here, there is testimony that the delayed treatment, the non-alignment of the fracture, and the trauma all contributed. The delay was plainly attributable to the negligence of the hospital, and the jury could also have found the hospital culpable for the improper alignment (there was testimony that proper practice called for the emergency room doctor to align the finger preliminarily, pending treatment by a specialist). This showing was sufficient to provide causation. See Brau, supra.
 
 
 40
 While there was conflicting testimony, the verdict was not against the weight of the evidence. Plaintiff supplied more than ample expert testimony and other evidence to make out her case. And, while the damages are high, the award was not so high in the circumstances as to shock the conscience. Generosity of an award does not justify an appellate reversal of a jury verdict so long as it is supportable under some rational appraisal of the damage based upon the evidence. Jay Edwards, Inc. v. New England Toyota Distributors, Inc., 708 F.2d 814, 819 (1st Cir.1983).
 
 IV.
 
 41
 Heddinger has appealed from the district court's denial of her request for attorneys' fees, expert witness fees, extraordinary expenses, and prejudgment interest. She argues that Fed.R.Civ.P. 54 and Puerto Rico Rule of Civil Procedure 44 entitle her to such relief. Assuming that these rules might afford relief under these circumstances, see Pan American World Airways v. Ramos, 357 F.2d 341 (1st Cir.1966), we detect no error. Federal Rule 54 nowhere makes the awarding of such expenses mandatory, and the decision is left to the sound discretion of the district court. The Puerto Rico Rule provides that such awards are left to the court's discretion, and that in the case of attorneys' fees and prejudgment interest, the judge must find that the party against whom such award is requested has been obstinate. Here, the district court found that defendants "did not act with temerity or obstinancy and in fact made a good faith effort to settle this case." We see no reason to disturb the district court's decision to deny the fees and expenses requested.
 
 
 42
 Affirmed.
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 [1]
 Considero, sin embargo, que debe ser suficiente que la conducta del actor presente racionales probabillidades de haber causado o de haber contibuido al dano para que se satisfaga el elemento de causalidad