Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María Cristina Herrera Bolivar y Andrés Rivera Llopiz, por sí y en Representación de su hijo menor G.A.R.H.<br><br>      Peticionarios<br><br>             v.<br><br>Efraín Ramírez Torres y Julie Vicéns Salgado, por sí, en representación de Y como miembros de la Sociedad Legal de Bienes Gananciales por ellos constituida; SIMED<br><br>      Recurridos | Certiorari<br><br>2010 TSPR 192<br><br>179 DPR \_\_\_\_ |

Número del Caso: CC-2008-519


Fecha: 25 de agoto de 2010


Tribunal de Apelaciones:

        Región Judicial de San Juan Panel III

Juez Ponente:        Hon. José A. Morales Rodríguez

Abogado da la Parte Peticionaria:


                Lcdo. Emilio Cancio Bello, Jr.

Abogado de la Parte Recurrida:


                Lcdo. Jesús R. Morales Cordero

Materia: Revisión de Sentencias de Negligencia y de Daños, Impericia Médica


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María Cristina Herrera Bolívar y Andrés Rivera Llopiz, por sí y en representación de su hijo menor G.A.R.H.<br><br>    Peticionarios<br><br>       v.<br><br>Efraín Ramírez Torres y Julie Vicéns Salgado, por sí, en representación de y como miembros de la Sociedad Legal de Bienes Gananciales por ellos constituída; SIMED<br><br>    Recurridos | CC-2008-519 |

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 25 de agosto de 2010

La señora María Cristina Herrera Bolívar y el señor Andrés Rivera Llopiz acuden ante este Foro, en representación de su hijo G.A.R.H., solicitando que se revoque una sentencia del Tribunal de Apelaciones, la cual redujo la cuantía de indemnización concedida al joven Rivera Herrera por la incapacidad total de su brazo izquierdo. Luego de evaluar detenidamente la prueba presentada ante el Tribunal de Primera Instancia, modificamos la sentencia emitida por el foro intermedio y reinstalamos la cuantía concedida por el juzgador primario.

## I.

El joven G.A.R.H. sufrió varios daños al nacer. Durante el parto mediante el cual llegó al mundo el 13 de mayo de 1994, ocurrió lo que se conoce como una distocia del hombro. Esto sucede cuando, al momento de la madre dar a luz, la cabeza del bebé está fuera del canal vaginal, pero el resto del cuerpo no sale, pues se queda atascado por los hombros. Para lograr sacar a G.A.R.H., el doctor Efraín Ramírez Torres, ginecólogo-obstetra que atendió a la señora María Cristina Herrera Bolívar, le practicó una proctoepisiotomía[1] y, posteriormente, le aplicó presión suprapúbica,[2] esto último sin asistencia de enfermera. Aún así el niño no salió. El Dr. Ramírez Torres le requirió a la Sra. Herrera Bolívar que siguiera pujando, mientras él realizó una fuerte tracción lateral y hacia abajo en la cabeza del bebé. Esa maniobra no cumplió su objetivo y, por el contrario, causó que el niño naciera con el brazo izquierdo paralizado y flácido, un hematoma en la parte anterior izquierda del pecho y una laceración en uno de los dedos del pie izquierdo.

En abril de 1995 la Sra. Herrera Bolívar, su esposo el señor Andrés Rivera Llopiz y la sociedad de gananciales compuesta por ambos, por sí y en representación de su hijo G.A.R.H., presentaron una demanda en contra del Dr. Ramírez

---

[1] Incisión entre el fondo de la vagina y el ano, cuyo propósito es crear mayor espacio para que el obstetra pueda maniobrar y el bebé nazca.
[2] Aquella que se aplica sobre el pubis de la mujer, con el propósito de empujar el hombro del bebé y lograr su nacimiento.

Torres, su esposa Julie Vicéns Salgado, la sociedad de gananciales compuesta por ambos y el Sindicato de Aseguradoras para la Suscripción Conjunta de Seguro de Responsabilidad Profesional Médico Hospitalaria (SIMED). En ésta, reclamaron una indemnización por los daños sufridos por su hijo G.A.R.H. y por ellos al éste nacer.

El Tribunal de Primera Instancia bifurcó los procedimientos y dirimió primeramente el aspecto de negligencia en el tratamiento médico del Dr. Ramírez Torres y la relación causal con los daños sufridos por G.A.R.H. Luego de un extenso juicio en el cual declararon varios peritos de ambas partes, el foro de instancia concluyó que durante el parto G.A.R.H. sufrió una lesión al plexo braquial que resultó en una parálisis de "Erb"[3] y una parálisis de "Klumpke",[4] ambas severas, por lo que la parálisis resultante era permanente. Igualmente, el foro primario concluyó que dichas lesiones fueron causadas por la acción del Dr. Ramírez Torres de halar o flexionar la cabeza del bebé para resolver la distocia del hombro, lo cual para 1994 no era una práctica aceptable de la medicina. Por lo tanto, el foro primario resolvió que la actuación del Dr. Ramírez Torres se desvió del cuidado médico indicado por la mejor práctica de la medicina para la fecha del parto y dictó una resolución declarando con lugar los aspectos de negligencia y relación causal de la

---

[3] Se trata de una lesión por estiramiento en los nervios del plexo braquial a nivel de los nervios c-5 y c-6.
[4] Se trata de una lesión del plexo braquial a nivel de los nervios c-7, c-8 y t-1.

demanda presentada. El Tribunal de Apelaciones confirmó dicha determinación y este Tribunal denegó revisar.

El 3 de mayo de 2006, el Tribunal de Primera Instancia celebró una vista evidenciaria sobre los daños sufridos por G.A.R.H. y su familia. En ésta declararon el doctor Néstor Cardona Cancio, la Sra. Herrera Bolívar y el joven G.A.R.H.. En su testimonio, el Dr. Cardona Cancio, quien es fisiatra, explicó un informe pericial que preparó para detallar los daños sufridos por el niño, el cual fue admitido en evidencia. Comenzó su testimonio reproduciendo el historial médico de G.A.R.H. Indicó que, prácticamente desde nacido, éste comenzó a tomar fisioterapias. A los cuatro días de vida, el doctor Eduardo Mirabal Font, neurocirujano, evaluó al niño y confirmó que existía daño permanente a los nervios del brazo izquierdo. Éste recomendó que se continuara con las fisioterapias, puesto que no era mucho más lo que se podía hacer para mejorar la condición del menor. Igual opinión le brindaron en el Miami Children's Hospital.

Para mejorar su estética, en el año 2001 cuando el niño contaba con seis años de edad, se le practicaron dos cirugías en el brazo que buscaban darle una apariencia más normal a éste, pues el mismo estaba deformado y tenía "forma de mono". Estas cirugías dejaron una cicatriz de cuatro (4) centímetros en forma de "L" y otra en forma de "C" que mide once (11) centímetros, las cuales son permanentes. Por otro lado, el Dr. Cardona Cancio también

testificó que si uno ve a G.A.R.H. de frente, va a haber el hombro izquierdo más bajo que el derecho. Dicha deformidad es producto de la parálisis de los músculos y tendones en esa área. La parálisis aludida causa también que el niño tenga el codo doblado todo el tiempo, como en forma de "L". Igualmente, al estar completamente dañados los nervios de esa área, la extremidad no se desarrolló de manera natural, por lo que el brazo izquierdo es más corto que el brazo derecho.

En relación con el daño sensorial, el Dr. Cardona Cancio testificó que G.A.R.H. tenía una marcada pérdida de sensación cutánea, lo que se traduce en un impedimento por déficit sensorial de ochenta y un por ciento (81%). Para poder explicar el daño en el movimiento del brazo, el Dr. Cardona Cancio dividió éste en tres troncos: superior, medio e inferior. Indicó que G.A.R.H. tenía cero por ciento (0%) de movimiento en el tronco superior e inferior y sólo un dieciocho por ciento (18%) de movimiento en el tronco medio. Al combinar los porcentajes de impedimento por movimiento con el impedimento por daño sensorial, resulta que G.A.R.H. tiene un noventa y nueve por ciento (99%) de pérdida de la función de su brazo, lo que se traduce en un cincuenta y nueve por ciento (59%) de impedimento de funciones fisiológicas generales. El Dr. Cardona Cancio señaló que la condición del brazo es permanente. Añadió que G.A.R.H. "básicamente tiene un brazo que para todos los efectos prácticos es inservible.

O sea, no, él no puede hacer nada con el brazo. Es lo mismo que si no lo tuviera".

El Dr. Cardona Cancio concluyó su testimonio recomendando que, cuando G.A.R.H. sea un adulto y así lo decida, se le ampute su brazo y se le coloque una prótesis. Indicó que en la actualidad existen prótesis capaces de ser controladas con movimientos en el hombro, lo que permite la flexión y extensión del codo, así como el abrir y cerrar de la muñeca. La colocación de la prótesis, además de brindarle mayor funcionalidad, mejoraría el aspecto estético, pues se vería un brazo extendido, que se mueve normalmente al caminar y que tiene un tamaño similar al otro brazo.

Por su parte, la Sra. Herrera Bolívar declaró que a G.A.R.H. le comenzaron a dar terapias a los cuatro (4) días de nacido, las cuales eran mediante electrochoques. Luego, a los seis (6) meses de edad, lo sometían diariamente a una terapia en el agua que le causaba gran dolor, pues gritaba durante la hora y media que duraba la misma. Al ver que la condición del niño no evolucionaba, se decidió intervenir quirúrgicamente —mediante las operaciones de las cuales testificó el Dr. Cardona Cancio— para de esa manera mejorar, al menos, la apariencia del brazo.

La Sra. Herrera Bolívar prosiguió su testimonio relatando acerca de las constantes burlas a las que otros niños de la escuela y de la vecindad someten a G.A.R.H. por causa de la deformidad de su brazo. Además, testificó

sobre las dificultades que éste enfrenta día a día para realizar lo que serían gestiones comunes para cualquier persona, como lo es ir al baño, vestirse y asearse. Igualmente, por su condición, G.A.R.H. no participa de actividades cotidianas de niños de su edad, como asistir al día de juegos de la escuela o jugar con los vecinos de su urbanización.

En cuanto a los deportes, testificó que a G.A.R.H. le encantan y que inclusive estuvo en un equipo de baloncesto. No obstante, indicó que luego de un juego en el cual un niño de su propio equipo le llamó "inútil" por G.A.R.H. perder el balón, éste salió de la cancha y no ha querido volver a practicar dicho deporte. Afirmó que lo único que su hijo G.A.R.H. quiere, es ser un niño normal. En cuanto a ella, al ser cuestionada sobre cómo se sentía con respecto a la situación de su hijo, indicó que "a mí me duele, como mamá, verlo a él llorar, a lo que se somete, tener que hablar con los amiguitos y decirles 'mira no se burlen'. . . . [E]s fuerte para mí como mamá. Es mi hijo el que está sufriendo, no es más nadie".

G.A.R.H. comenzó su testimonio con las preguntas introductorias de rigor. Luego se le preguntó sobre el incidente con el niño en el juego de baloncesto, relatado anteriormente, a lo que éste respondió que se sintió muy mal con dicha situación. La jueza que presidía los procedimientos interrumpió el testimonio de G.A.R.H. y llamó a los abogados al estrado. El abogado del demandado

Dr. Ramírez Torres, estipuló el testimonio de G.A.R.H. en relación con sus daños, entendiendo que sería prueba corroborativa de la ofrecida por su madre, la Sra. Herrera Bolívar. Igualmente, las partes acordaron estipular el testimonio del padre de G.A.R.H., el Sr. Andrés Rivera Llopiz.

Por último, las partes estipularon dos informes periciales. El primero, el informe de la doctora Filí-Melé Rodríguez, especialista en prótesis, el cual detalló el costo, duración y reemplazo de una prótesis de brazo -similar a la recomendada por el Dr. Cardona Cancio en su testimonio- para ser utilizada desde que G.A.R.H. alcance su mayoría de edad, hasta los 74 años que era la expectativa de vida de un varón en Puerto Rico para el año 2005. Igualmente, se estipuló el informe que contenía una evaluación psiquiátrica de G.A.R.H., preparado por la Dra. Dayra Fernández Demorizi. De dicho informe surge que, a lo largo de las entrevistas con la Dra. Fernández, G.A.R.H. presentó desesperanza, pobre control de impulsos, agresividad, trastorno en el patrón de sueño, alimentación, falta de interés por las cosas que antes hacía, aislamiento, disminuida atención y concentración.

Según la opinión de la Dra. Fernández, G.A.R.H. padece una depresión mayor, la cual se debe totalmente a la pérdida de función y atrofia de su brazo izquierdo. Las limitaciones que la pérdida de su brazo le causan "lo llevaron al ostracismo, impotencia y frustración". El

niño, según la doctora, se verá a sí mismo siempre como "el manco". Luego de señalar todas las profesiones y oficios que, a su juicio, G.A.R.H. no podrá llevar a cabo, concluye que éste será un niño marcado severamente de por vida por sus limitaciones físicas, afectivas, sociológicas y psicológicas.

Examinada la prueba testifical, documental y pericial recibida, el foro de instancia dictó sentencia en la cual adjudicó los daños sufridos por G.A.R.H. y su familia. El foro primario indicó que concedía a G.A.R.H. la suma de $1,569,500.00 "por los daños de los sufrimientos y angustias mentales, intervenciones quirúrgicas pasadas y futuras". Para llegar a dicha cifra, el foro de instancia hizo formar parte de su sentencia el informe de la Dra. Rodríguez, el cual indicaba que el costo de la prótesis recomendada y su mantenimiento por 53 años de vida sería de $969,500.00, lo que el foro de instancia consideró como una intervención quirúrgica futura. Por lo tanto, podemos colegir que el foro primario otorgó $600,000.00 a G.A.R.H. por los daños morales por la pérdida de su brazo, los que incluyen los sufrimientos físicos y angustias mentales.

En cuanto a su familia, el foro de instancia concedió una indemnización de $350,000.00 a la Sra. Herrera Bolívar por sus sufrimientos y angustias mentales y $200,000.00 al Sr. Rivera Llopiz por igual concepto. El foro primario también impuso $5,000.00 en honorarios de abogado al determinar que los demandados "actuaron con manifiesta

temeridad, máxime cuando la determinación de responsabilidad por negligencia ya tenía finalidad". En total, el Tribunal de Primera Instancia ordenó al Dr. Ramírez Torres, su esposa y la sociedad legal de gananciales el pago de $2,119,500.00 de los cuales SIMED tendría que desembolsar el límite de la póliza, la cantidad de $200,000.00.

Inconformes, los demandados acudieron al foro intermedio. En dicho foro, impugnaron la determinación de negligencia en contra del Dr. Ramírez Torres y el nexo causal con los daños sufridos por el joven G.A.R.H. También alegaron que las cuantías concedidas por el foro de instancia eran exageradamente altas. Se alegó específicamente que la cuantía de $969,500.00 por el costo de la prótesis del brazo de G.A.R.H., además de ser exageradamente alta, era altamente especulativa, pues dependía de que en un futuro G.A.R.H. decidiera realizarse dicha operación, de lo cual no había seguridad. Los demandados cuestionaron, por último, la imposición de honorarios de abogado.

El Tribunal de Apelaciones modificó la sentencia apelada. Indicó que las cuantías concedidas por el foro primario eran exageradamente altas. En el caso de las compensaciones concedidas a los padres de G.A.R.H., comparó éstas con las otorgadas por este Tribunal en *Riley v. Rodríguez Pacheco*, 119 D.P.R. 762 (1987) y *Merced v. Gobierno de la Capital*, 85 D.P.R. 552 (1962). En *Riley v.*

*Rodríguez Pacheco* se le concedieron $100,000.00 por sufrimientos y angustias mentales a la madre de una niña que sufrió una anoxia cerebral durante el parto. Por otro lado, en *Merced v. Gobierno de la Capital*, se le concedieron $3,000.00 por sufrimientos y angustias mentales a cada uno de los padres de un niño que perdió su brazo izquierdo luego de sufrir una caída. Explicó el foro intermedio que, luego de actualizadas las indemnizaciones en los casos citados, las compensaciones otorgadas en este caso comparadas con el caso de *Riley* no eran exageradamente altas, pero comparadas con *Merced v. Gobierno de la Capital* sí lo eran, por lo que las redujo a $260,000.00 para la Sra. Herrera Bolívar y $150,000.00 para el Sr. Rivera Llopiz.

En relación con los daños de G.A.R.H., el Tribunal de Apelaciones resolvió que la partida de $969,500.00 no era especulativa, pues dos peritos confirmaron que la única oportunidad de mitigar adecuadamente el daño permanente al brazo izquierdo del joven es amputarlo e instalarle una prótesis, cuando ya su cuerpo se haya desarrollado completamente. Sin embargo, el foro intermedio resolvió que dicha cuantía debía quedar bajo la tutela del Tribunal de Primera Instancia hasta el momento en que se realice la operación recomendada. De G.A.R.H. decidir no llevar a cabo la mencionada operación, deberá devolverse el dinero consignado con cualquier interés acumulado.

En cuanto a la partida por daños morales de G.A.R.H., el Tribunal citó nuevamente el caso de *Merced v. Gobierno de la Capital*, *supra*, e indicó que allí este Tribunal le concedió $24,000.00 en daños morales al niño que perdió su brazo izquierdo. El Tribunal de Apelaciones, sin especificar la manera en que lo hizo, actualizó dicha cantidad al 2007, e indicó que equivalían a $264,000.00. Expresó que, tomando en consideración las circunstancias particulares del caso, reducía la indemnización de $600,000.00 a $300,000.00. Por otro lado, el foro intermedio confirmó la determinación de temeridad y la cuantía impuesta por el foro de instancia por concepto de honorarios de abogado.[5]

Inconformes, los demandantes acuden a este Foro, arguyendo que erró el Tribunal de Apelaciones al reducir las cuantías concedidas por el Tribunal de Primera Instancia. A lo largo de su escrito, sólo se discute la alegada actuación errada del foro intermedio de reducir la partida por daños morales de G.A.R.H. de $600,000.00 a $300,000.00, no las reducciones a las compensaciones de los padres. Por lo tanto, sólo revisaremos la compensación de G.A.R.H..[6]

_____

[5] En relación con la determinación de temeridad, el Tribunal de Apelaciones añadió que el Dr. Ramírez Torres había demostrado temeridad inclusive ante ese foro, pues cuestionó nuevamente la determinación de negligencia y causalidad, la cual ya había sido adjudicada anteriormente en su contra y constituía "la ley del caso" por haber sido traída hasta este Foro.

[6] Tampoco se cuestiona la determinación del Tribunal de Apelaciones de consignar la cantidad de $969,500.00 hasta

**II.**

En innumerables ocasiones hemos establecido que "la tarea judicial de estimar y valorar los daños resulta difícil y angustiosa, debido a que no existe un sistema de computación que permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas". *Vázquez Figueroa v. E.L.A.*, 172 D.P.R. 150, 154 (2007); *Nieves Cruz v. Universidad de Puerto Rico*, 151 D.P.R. 150, 169-70 (2000); *Blas v. Hospital Guadalupe*, 146 D.P.R. 267, 339 (1998).

Por tal razón, es norma reiterada que los tribunales apelativos no deben intervenir con la estimación de los daños que los tribunales de instancia realicen, salvo cuando la cuantía concedida advenga ridículamente baja o exageradamente alta. *Flores Berger v. Colberg*, res. el 20 de mayo de 2008, 2008 T.S.P.R. 90, 173 D.P.R. ____ (2008); *Urrutia v. A.A.A.*, 103 D.P.R. 643, 647-48 (1975). Esta norma responde al hecho de que la valorización de los daños está sujeta a un cierto grado de especulación y conlleva "elementos subjetivos, tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos". *S.L.G. Rodríguez v. Nationwide*, 156 D.P.R. 614, 622 (2002). Claramente, los jueces de instancia están en mejor posición que los tribunales apelativos para hacer esta evaluación, toda vez que éstos son los que tienen

_____

que G.A.R.H. advenga a la mayoría de edad y lleve a cabo la operación de instalación de prótesis, si es que decide realizarla.

contacto directo con la prueba presentada. *Blas v. Hospital Guadalupe*, *supra*, pág. 339; *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 451 (1985).

Para determinar si las cuantías concedidas por el foro de instancia advienen "ridículamente bajas o exageradamente altas" el tribunal revisor debe examinar, además de la prueba desfilada ante el foro primario, las concesiones de daños en casos anteriores similares. Esto es así, pues "si bien es cierto que no existen dos casos exactamente iguales y que cada caso es distinguible según sus propias circunstancias, a los fines de determinar si la valorización de los daños en un caso específico es o no adecuada, ciertamente resulta de utilidad examinar las cuantías concedidas por este Tribunal en casos similares anteriores". *Agosto Vázquez v. F.W. Woolworth & Co.*, 143 D.P.R. 76, 81-82 (1997). *Véase también* R. B. Cappalli, *Tort Damages in Puerto Rico*, 46 Rev. Jur. U.P.R. 241 (1977).

Dichas indemnizaciones en casos anteriores constituyen un punto de partida y deben, en todo caso, ser ajustadas al valor presente de las mismas, pues sabemos que existe una relación inversamente proporcional entre el costo de la vida y el poder adquisitivo del dólar. *Rojas v. Maldonado*, 68 D.P.R. 818, 830 (1948). El poder adquisitivo del dólar se determina "tomando como base el costo en dinero de las cosas esenciales para la vida, tales como los alquileres, vestidos, alimentos y combustibles durante un período de

tiempo determinado, para compararlo con el costo en dinero de esas mismas necesidades durante un período anterior de igual duración". *Id.* Por lo tanto, para poder llevar a cabo una valoración justa y razonable de la indemnización a concederse, es necesario determinar el poder adquisitivo del dólar al momento en que se emite la sentencia, para poder compararlo con dicho factor al momento de la concesión de indemnización en el caso anterior. *Véase* A. J. Amadeo Murga, *El Valor de los Daños en la Responsabilidad Civil*, San Juan, Editorial Esmaco, 1997, Tomo I, pág. 95.

El licenciado Amadeo Murga, no obstante, advierte que el poder adquisitivo del dólar no es siempre el único factor a considerar para ajustar una cuantía concedida en un caso anterior a uno actual, especialmente cuando ha pasado mucho tiempo entre uno y otro caso. *Id.*, pág. 96. En tales ocasiones es indispensable, además, hacer otro ajuste por el crecimiento económico que pudo haber ocurrido entre un tiempo y otro. Es decir, es necesario adecuar la compensación anterior a una nueva economía que goza de un nivel o estándar de vida mayor y que –como resultado principalmente del desarrollo tecnológico– goza de mayores bienes y servicios. *Id.* Si se ignora ese componente, se estaría adjudicando una cuantía que responde a una economía en la cual no existían los bienes y servicios que han advenido necesarios en la vida cotidiana actual, por lo cual la indemnización sería igualmente insuficiente. *Id.*,

pág. 97. En tales casos, comparar el ingreso per cápita personal para el tiempo de la concesión anterior con el ingreso per cápita personal actual ofrece un buen indicativo del crecimiento económico o el aumento real en bienes y servicios de la sociedad, de manera que se pueda ajustar adecuadamente la indemnización anterior a la economía actual. *Id.*

Realizados dichos cálculos, la cuantía resultante debe ser analizada a la luz de las circunstancias particulares del caso considerado ante el Tribunal. *Véase*, *Escobar Galarza v. Banuchi Pons*, 114 D.P.R. 138, 148 (1983) (Sentencia) (Op. Concurrente Juez Asociado Rebollo López). Los tribunales revisores debemos intervenir con la indemnización concedida solamente cuando, tomando en cuenta las concesiones por daños en casos similares anteriores actualizadas al momento de la sentencia, y a la luz de las circunstancias particulares del caso ante la consideración del Tribunal, la cuantía concedida se desvía manifiestamente de lo que sería una indemnización razonable por ser "ridículamente baja o exageradamente alta".

Establecidos estos principios, pasemos a analizar la actuación del Tribunal de Apelaciones al disminuir la cuantía concedida al joven G.A.R.H. por sus daños morales.

### III.

En la sentencia recurrida, el Tribunal de Apelaciones, luego de referirse extensamente al informe de la psiquiatra Dra. Fernández, concluyó que los daños morales de G.A.R.H.

fueron adecuadamente probados en la vista evidenciaria celebrada. No obstante, dicho foro estimó que la suma otorgada por el foro de instancia fue "exageradamente alta". Para llegar a tal conclusión, según relatamos anteriormente, el foro intermedio citó el caso de *Merced v. Gobierno de la Capital*, *supra*, en el cual concedimos $24,000.00 de indemnización a un niño que perdió su brazo izquierdo. El foro intermedio indicó que "esta cuantía ajustada al año 2007 equivale, aproximadamente, a $264,000". Sin embargo, como indicamos, el foro intermedio no explicó de qué manera realizó la actualización de la compensación para llegar a tal cifra.

Según expusimos antes, para actualizar una compensación pasada debemos tomar en consideración el poder adquisitivo del dólar al momento de concederla comparado con aquel imperante al momento de dictarse la sentencia correspondiente. Para determinar el poder adquisitivo del dólar se utiliza el Índice de Precios al Consumidor ("CPI"), el cual es publicado mensualmente por la División de Estadísticas del Departamento del Trabajo y Recursos Humanos, y que se define como "un indicador estadístico que mide, entre dos períodos específicos, el cambio relativo promedio ocurrido en los precios al por menor de las mercaderías y servicios que consumen todas las familias en Puerto Rico". *Véase*, D.T.R.H, *Índice de Precios al Consumidor en Puerto Rico para enero de 2007*, disponible en http://www.netempleopr.org/almis23/ver_publicaciones.jsp?div=2,

última visita el 7 de julio de 2010. El inverso de dicho índice es el poder adquisitivo del dólar, el cual es definido por el Departamento del Trabajo como "la capacidad que tiene el dólar para comprar bienes y servicios, si se compara con su valor de 100 centavos en el período base". *Id*. Para determinar el poder adquisitivo del dólar para el 2007, se utilizaba el 1984 como valor base.

Para actualizar una cuantía concedida anterior a 1984, es necesario multiplicar dicha compensación por el valor adquisitivo del dólar del año correspondiente para llevarlo hasta 1984. Luego, para compensar por la pérdida de valor de la moneda, dicha cantidad se divide por el poder adquisitivo del dólar para el año deseado posterior a 1984. Amadeo Murga, *op. cit.*, pág. 101. Las tablas incluidas en la obra del licenciado Amadeo Murga contienen un resumen de los poderes adquisitivos del dólar para Puerto Rico y los Estados Unidos desde el 1914 hasta el 2000. *Id.*, págs. 106-10 & Supl. 2000.[7]

Por ejemplo, para ajustar la indemnización de $24,000.00 concedida en *Merced v. Gobierno de la Capital*, *supra*, en 1962, es necesario llevar dicha cifra a 1984 y luego a abril de 2007, fecha de la sentencia enmendada.

---

[7] Para años posteriores al 2000, se pueden utilizar directamente las estadísticas publicadas por el Departamento del Trabajo, disponibles en http://www.net-empleopr.org/almis23/cpi_busqueda_tmpl.jsp, última visita el 7 de julio de 2010. Para obtener el CPI en los Estados Unidos, se puede acceder el portal del Negociado de Estadísticas del Empleo adscrito al Departamento del Trabajo de los Estado Unidos, en http://www.bls.gov/cpi, última visita el 7 de julio de 2010.

Para realizar dicho cálculo, es necesario multiplicar la cuantía de 1962 ($24,000.00) por el factor incluido para ese año en la tabla para Puerto Rico (2.82), lo que equivale a $67,680.00. Luego, para actualizar los $67,680.00 del año 1984 al 2007 es necesario dividir esa cifra por el poder adquisitivo del dólar a abril de 2007, que es de 28 centavos.[8] Por lo tanto, $67,680.00 divididos por $0.28 equivale a $241,714.29.

Sin embargo, dicha compensación fue otorgada hace casi cincuenta años, por lo que es necesario realizar un ajuste adicional por el crecimiento de la economía entre el 1962 y el 2007. Para efectos de este ejercicio, utilizaremos las tablas contenidas en el suplemento de la obra del licenciado Amadeo Murga, las cuales reflejan el cambio en los ingresos personales per cápita en los Estados Unidos entre 1960 y 1998.[9] Según dichas tablas, la economía creció por un factor de 2.28 aproximadamente entre esos dos períodos. *Véase* Amadeo Murga, *op. cit.*, Supl. 2000, págs.

---

[8] *Véase* el Informe del Departamento del Trabajo y Recursos Humanos para abril de 2007, disponible en http://www.net-empleopr.org/almis23/publicaciones/Costo%20de%20Vida/Indice%20de%20Precios%20al%20Consumidor%20%2004-2007.pdf, última visita el 7 de julio de 2010.

[9] Se utilizan las estadísticas de aumento en el nivel de vida de los Estados Unidos, pues como sabemos la economía de Puerto Rico generalmente es un reflejo de la economía de los Estados Unidos. Si se utilizaran las estadísticas de Puerto Rico, probablemente el aumento resultaría mayor, pues Puerto Rico partió de un nivel de vida más bajo. *Véase* A. J. Amadeo Murga, *El Valor de los Daños en la Responsabilidad Civil*, San Juan, Editorial Esmaco, 1997, Tomo I, pág. 102, nota al calce 24. Las tablas de estos valores se obtienen a través del U.S. Bureau of Economic Analysis, ahora disponible en http://www.bea.gov, última visita el 7 de julio de 2010.

6-8. Al multiplicar la cuantía concedida en *Merced v. Gobierno de la Capital*, *supra*, actualizada a abril de 2007 -$241,714.29- por el crecimiento económico durante ese período (2.28) iguala a $551,108.58. Dicha cantidad es la equivalente a los $24,000 de 1962, actualizado tanto por el poder adquisitivo del dólar como por el crecimiento de la economía, esto último sólo hasta 1998.[10]

Dicha cifra es cónsona igualmente con otro caso resuelto por este Tribunal en el cual un niño perdió el noventa por ciento (90%) de capacidad de su brazo izquierdo. En *Ruiz Santiago v. E.L.A.*, 116 D.P.R. 307 (1985), modificamos una sentencia del Tribunal de Primera Instancia que había concedido $145,000.00 por los daños morales sufridos por un niño de cuatro años y medio de edad causados por la negligencia en el cuidado y tratamiento médico con posterioridad a una operación realizada en uno de los hospitales del Estado. Redujimos en $10,000.00 los daños morales del niño por entender que existía cierta duplicidad en las partidas otorgadas por el foro de

---

[10] Otra forma de realizar dicho cálculo es tomar la diferencia en el crecimiento entre un período y otro, multiplicarla por la cuantía actualizada por la inflación para obtener el ajuste por aumento de vida y luego sumar dicho resultado a la cuantía actualizada. En el ejemplo que tenemos, la diferencia entre un período y otro es de 128%. Se divide esa cifra por cien para llevarlo a puntos, lo que equivale a 1.28 y dicho resultado se multiplica por la cuantía actualizada -$241,714.29- lo que equivale a $309,394.29. Dicha cifra, que constituye el ajuste por el aumento en el nivel de vida, se le suma a la cuantía actualizada por la inflación -$241,714.29- y llegamos al mismo resultado de $551,108.58.

instancia.[11]    Así,   la   indemnización   por   daños   morales ascendió a $135,000.00.

En el 1985, el dólar todavía tenía el mismo valor de cien   centavos,   igual   a   1984.    Para   actualizar   los $135,000.00 del año 1985 al 2007, dividimos esa cantidad por $0.28, lo que equivale a $482,142.85, una cantidad muy por   encima   de   los   $300,000.00   otorgados   por   el   foro intermedio en este caso.  Por razón de que han pasado más de veinte años entre una y otra compensación, es necesario ajustar   igualmente   por   el   crecimiento   económico.    Al multiplicar por el factor de crecimiento entre el 1985 y el 1998 (1.19), eso equivale a $573,750.00.

Por lo tanto, al examinar las cuantías concedidas en los casos de *Merced v. Gobierno de la Capital* y *Ruiz Santiago v. E.L.A.*, actualizadas correctamente a abril de 2007, $551,108.57 y $573,750.00, respectivamente, vemos que son aproximadas a los $600,000.00 otorgados por el foro de

---

[11] En aquel caso el foro de instancia había otorgado por "[l]os   daños   físicos   pasados   y   presentes   del   menor, $25,000.00;   los   daños   físicos   y   limitación   física   que sufrirá el resto de su vida Alex, $30,000.00; las angustias y   sufrimientos   mentales   presentes   y   futuros   de   Alex, incluyendo el desorden depresivo que padece y que limitan su   capacidad   sicológica,   $40,000.00;   la   incapacidad   física total   de   la   mano   izquierda   y   del   brazo   izquierdo   (90%) la[s] cuales combinadas ascienden a un 54% de inca[pa]cidad de   sus   funciones   fisiológicas   generales,   $50,000.00;   la pérdida   de   ingreso   futur[o],   $65,000.00".    *Véase*,   *Ruiz Santiago   v.   E.L.A.*,   116   D.P.R.   307,   322   (1985). Consideramos   que   había   cierta   duplicidad   entre   la   partida de "limitación física futura" y la incapacidad física total de   la   mano   izquierda   y   del   noventa   por   ciento   (90%)   del brazo izquierdo, por lo que la redujimos por $10,000.00. *Íd.*, en la pág. 323.

instancia en este caso.[12] De primera intención, y sin examinar las particularidades de este caso, la cuantía otorgada por el foro primario parece ser razonable. Si bien es cierto que no existen fórmulas matemáticas o científicas que nos indiquen cómo se justiprecia el dolor y el sufrimiento, ni "una tabla o computadora electrónica que recoja todos los elementos y premisas inarticuladas que nutren la valoración del dolor físico y mental humano", consideramos que una indemnización que se ajuste a aquellas que concedimos anteriormente en casos similares reviste de razonabilidad *prima facie*, y no será alterada, salvo que las circunstancias particulares del caso ante la consideración del Tribunal así lo exijan.[13] *Véase*, *Urrutia v. A.A.A.*, *supra*. *Véase además*, J.J. Álvarez González, *Responsabilidad Civil Extracontractual*, 78 Rev. Jur. U.P.R. 457, 459-65 (2009).

Al examinar las circunstancias particulares de este caso, somos del criterio que la cuantía otorgada por el Tribunal de Primera Instancia se justifica a la luz de los daños sufridos por G.A.R.H. En el foro de instancia se presentó abundante prueba que valida la magnitud de los daños sufridos por el niño, como consecuencia de la actuación negligente del demandado Dr. Ramírez Torres. El

---

[12] Las cifras actualizadas son aproximadas a la cuantía otorgada por el foro primario, aún tomando en consideración que el ajuste por el crecimiento económico se hizo solamente hasta 1998 y no hasta el 2007.
[13] Esto no excluye el que el demandante o el demandado pueda demostrar que las cuantías otorgadas en los casos anteriores similares son, de suyo, irrazonables.

Dr. Cardona Cancio y la Sra. Herrera Bolívar testificaron sobre los numerosos daños y sufrimientos físicos que G.A.R.H. ha padecido desde su nacimiento, las diversas intervenciones quirúrgicas a las cuales ha sido sometido, así como de las múltiples limitaciones que en su vida ha significado el no contar con su brazo izquierdo. Además, la deformidad de su brazo es patentemente visible, según las determinaciones del foro de instancia, lo que redunda en constantes miradas y comentarios en torno a su condición.

En el plano de los sufrimientos y angustias mentales, el foro primario destacó en sus determinaciones de hechos que "a simple vista resalta una profunda y triste mirada en su rostro (de G.A.R.H.) y en un tenso momento que se suscit[ó] en Sala cuando lloró, sin consuelo, tuvimos un cercano encuentro con la desolación que vive ante su desafortunado defecto físico. . . . [D]icho de otro modo, respira infelicidad". Esa determinación de hechos del foro de instancia va de la mano del informe pericial de la Dra. Fernández que concluye que G.A.R.H. padece de una depresión mayor como consecuencia de hallarse incapacitado por no contar con su brazo izquierdo y verse a sí mismo como "el manco".

Tomando en consideración las circunstancias particulares de este caso, y luego de examinar las cuantías concedidas en casos similares anteriores, es forzoso concluir que la indemnización de $600,000.00 por daños

morales concedida por el Tribunal de Primera Instancia no fue "exageradamente alta" como concluyó el foro intermedio. Al contrario, es razonable para paliar de alguna forma los sufrimientos y angustias que el niño ha sufrido y seguirá sufriendo en el futuro por causa de la negligencia del Dr. Ramírez Torres. Por tal razón, procede modificar la sentencia del Tribunal de Apelaciones, a los efectos de reinstalar la indemnización de $600,000.00 por los daños morales de G.A.R.H., y así modificada, se confirma.

Se dictará sentencia de conformidad.


                                        Anabelle Rodríguez Rodríguez
                                                Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María Cristina Herrera Bolívar y Andrés Rivera Llopiz, por sí y en representación de su hijo menor G.A.R.H.<br><br>Peticionarios<br><br>v.<br><br>Efraín Ramírez Torres y Julie Vicéns Salgado, por sí, en representación de y como miembros de la Sociedad Legal de Bienes Gananciales por ellos constituída; SIMED<br><br>Recurridos | CC-2008-519 |

SENTENCIA

San Juan, Puerto Rico, a 25 de agosto de 2010

Por los fundamentos expresados en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, este Tribunal dicta sentencia modificando la sentencia del Tribunal de Apelaciones, a los efectos de reinstalar la indemnización de $600,000.00 concedida por el foro primario por los daños morales de G.A.R.H., y así modificada, se confirma.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Martínez Torres y la Jueza Asociada señora Pabón Charneco concurren con el resultado sin opinión escrita.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo