ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| RUTH FELICITA CUBERO APONTE, GILBERTO ENRIQUE GONZÁLEZ GONZÁLEZ, GEORGE CUBERO REYES, LIZA MATTEI OYOLA, JUAN SANTIAGO LÓPEZ<br><br>Apelados<br><br>v.<br><br>AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS<br><br>Apelante | KLAN202401066 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Civil. Núm. BY2018CV04559<br><br>Sobre:<br>Daños a la propiedad |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Candelaria Rosa, la Jueza Díaz Rivera y el Juez Sánchez Báez[1]

Sánchez Báez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 6 de noviembre de 2025.

Compareció ante nos la apelante, Autoridad de Acueductos y Alcantarillados (en adelante, "apelante" o "AAA"). Nos solicitó la revisión de la *Sentencia* emitida y notificada el 27 de agosto de 2024 por el Tribunal de Primera Instancia, Sala de Bayamón. En la misma, el Foro Primario declaró *Ha Lugar* la demanda en su contra.

Por los fundamentos que expondremos a continuación, se **confirma** la *Sentencia* apelada.

**-I-**

El 7 de diciembre de 2018 la Sra. Ruth F. Cubero Aponte (en adelante, "señora Cubero Aponte"), Sr. Gilberto E. González González y Sr. George Cubero Reyes,[2] quienes residían en el Lote

---

[1] Mediante la Orden Administrativa OATA-2025-018 emitida el 10 de febrero de 2025 se designó al Juez Isaías Sánchez Báez en sustitución de la Jueza Camille Rivera Pérez.

[2] Aclaramos que, surge del expediente que, el 29 de agosto de 2022, el Tribunal de Primera Instancia emitió una *Sentencia Parcial*, mediante la causa de acción de parte de Gilberto E. González González y George Cubero Reyes por ausencia de prueba.

Núm. 1 ubicado Villa de Monte Carlo, en Toa Alta, así como Sra. Lisa M. Mattei Oyola (en adelante, "señora Mattei Oyola") y el Sr. Juan R. Santiago López (en adelante, "señor Santiago López"), quienes residían en el Lote Núm. 2 en la misma dirección (en adelante y en conjunto, "parte demandante" o "apelados"), presentaron una *Demanda* sobre daños y perjuicios.[3] La aludida reclamación se presentó en contra de la AAA, Multinational Insurance Company, antes National Insurance Company, Gloria E. Morales Miranda, Eliseo López Resto y su cónyuge Iris N. Cabrera Maysonet.[4]

En el pliego, la parte demandante alegó que, el 6 de octubre de 2008, se averió una tubería de agua potable que le pertenecía a la AAA y estaba ubicada en la Carretera Núm. 159, en Toa Alta, y que colindaba con las propiedades de la parte demandante. Arguyó que el salidero de agua de la referida avería socavó los cimientos de las propiedades en controversia, provocando daños severos en las estructuras.

Por estos hechos, la parte demandante razonó que la AAA tenía conocimiento sobre la predisposición de la tubería a averiarse y no tomó las medidas adecuadas para evitar su rotura, por lo que adujo que esta actuó de manera negligente. Arguyó que las referidas propiedades sufrieron daños estructurales, consistentes en grietas y filtraciones. Igualmente, sostuvo que sufrió daños emocionales y económicos como consecuencia de dicho suceso. En fin, la parte demandante planteó que los daños ascendían a doscientos mil dólares ($200,000.00) por cada lote afectado.

---

[3] Apéndice del apelante, págs. 24-27.
[4] Señalamos que, surge del expediente que, el 5 de febrero de 2020, el Tribunal de Primera Instancia desestimó la causa de acción por falta de emplazamiento a favor de Multinational Insurance Company. Igualmente, el 12 de mayo de 2020, el Foro Primario desestimó el caso en contra de los codemandados Gloria E. Morales Miranda, Eliseo López Resto y su cónyuge Iris N. Cabrera Maysonet, por falta de emplazamiento.

Posteriormente, el 28 de junio de 2019, la AAA presentó su *Contestación a Demanda*.[5] En lo pertinente, esta negó que existiese un nexo causal entre la avería de la aludida tubería y los daños alegadamente sufridos por las respectivas propiedades.

Tras de varios asuntos procesales, el 25 de agosto de 2022, comenzó el juicio en su fondo. Surge de la *Minuta* que la parte apelante presentó a su perito en suelos, el ingeniero geotécnico Marcus García Vincenty (en adelante, "ingeniero García Vincenty").[6] En específico, el ingeniero García Vincenty declaró que preparó un informe, en el cual revisó los informes preparados por los peritos de la AAA: el ingeniero Orban Mendoza, el geólogo Jesús Torres Ortiz, el ingeniero Emiliano Ruiz Pla y del doctor Rodríguez Pérez.[7] Indicó que estaba de acuerdo con las conclusiones de estos sobre que la saturación del terreno resultó en que ocurriesen los deslizamientos de la tierra, lo que provocó que las casas se agrietaran. Declaró que la geología y la composición del subsuelo del área en la cual se ubicaban las propiedades en controversia era susceptible a deslizamientos desde hace muchos años.[8] Igualmente, señaló que en su informe concluyó que "no ha[bía] duda de que la rotura de la tubería ha[bía] empeorado a situación de las residencias en cuestión".[9] Además, expresó lo siguiente:

> Cuando esta tubería se rompe, aumenta la saturación del subsuelo provocando así más desplazamientos del terreno deslizándose [...] y si la tubería permanece rota luego del evento de lluvia, el efecto es mayor. Es decir, aunque el deslizamiento existía, la tubería es un factor desencadenante en producir más movimientos del deslizamiento, afectando así aún más a las estructuras en cuestión.[10]

En el contrainterrogatorio, el ingeniero García Vincenty declaró que no observó grietas estructurales en el Lote Núm. 2.

---

[5] *Íd.*, págs. 34-44.
[6] *Íd.*, págs. 228-231.
[7] Transcripción del 25 de agosto de 2022, pág. 71.
[8] Apéndice del apelante, págs. 76-77.
[9] *Íd.,* pág. 84.
[10] *Íd.*, pág. 85, Línea 5-18.

Además, sostuvo que no tenía ningún dato para sostener si ocurrió primero la rotura del tubo o las grietas de la estructura.[11] Indicó que tampoco observó prácticas de mitigación en el lugar en controversia.[12] Señaló que, tanto el peso de las estructuras edificadas, como el agua, podían afectar la estabilidad del terreno y ser un detonante para los deslizamientos.[13] Asimismo, reconoció que la rotura de la tubería empeoró la situación por haber añadido agua.[14] Declaró que estaba de acuerdo con el doctor Carlos Rodríguez Pérez en que, posterior al 2008, la tierra ha continuado moviéndose sin que haya una ruptura de la tubería.

Por su parte, en esta misma fecha testificó la señora Cubero Aponte, quien vivía en el Lote Núm. 1. Esta declaró que, el 5 de octubre de 2008, la señora Mattei Oyola le informó que se veía agua bajando por su propiedad.[15] Luego, el 6 de octubre de 2008, se percató que había un flujo de agua bien grande que se originaba de una fisura en la Carretera Núm. 159, pasaba por el talud del Lote Núm. 1 y continuaba hasta el Lote Núm. 2. Por ello, la señora Cubero Aponte testificó que llamó a la AAA para hacer la querella correspondiente. Sin embargo, declaró que, a pesar de acudir al área en cuestión, los funcionarios de la AAA no resolvieron la situación, por lo que continuó discurriendo agua durante la noche. Al día siguiente, el 7 de octubre de 2008, la señora Cubero Aponte expresó que el flujo del agua empeoró, inundando ambos Lotes.[16] Declaró que la fisura de la referida carretera se agrandó, creando un hoyo gigante en esta y exponiendo la tubería rota. Indicó que, a pesar de que la policía, el personal de emergencias y la AAA acudieron a la escena, el flujo del agua continuó durante la noche, inundando aún

---

[11] *Íd.*, pág. 109.
[12] *Íd.*, pág. 125.
[13] *Íd.*, pág. 141.
[14] *Íd.*, págs. 142-143.
[15] *Íd.*, pág. 199.
[16] *Íd.*, págs. 205-206.

más su terreno. Es entonces cuando se percató de las grietas en su propiedad.[17] Además, la señora Cubero Aponte declaró que durante esos días estuvo soleado y que no llovió. Expresó que su casa se volvió inhabitable. Señaló que en las noches escuchaba chillidos y que las grietas eran constantes. Insistió en que vio el tubo roto con el flujo de agua saliendo y que esta caía en su propiedad, lo cual sostuvo que socavó la zapata de su casa.[18]

Así las cosas, el 29 de agosto de 2022, el juicio en su fondo continuó.[19] En esta vista, testificaron los demandantes, la señora Mattei Oyola y el señor Santiago López. En resumen, la señora Mattei Oyola declaró que, en octubre de 2008, se percató, junto a su esposo, el señor Santiago López, de que había unas grietas en la Carretera Núm. 159 de las que salía agua. Testificó que hizo la querella correspondiente ante la AAA. Al no ver respuesta, llamó al manejo de emergencias. Declaró que, aproximadamente como tres (3) días después, llegó AAA para que arreglar la tubería averiada.[20] Además, expresó que, como consecuencia del deslizamiento que hubo, su propiedad se agrietó.

Igualmente, testificó el señor Santiago López. En síntesis, este declaró que el observó agua discurriendo por la Carretera Núm. 159 durante aproximadamente tres (3) días.[21] Indicó que los terrenos comenzaron a afectarse y su casa, el Lote Núm. 2, se agrietó. En específico, declaró que la ventana, el techo, la marquesina, y la acera frente a su casa, se agrietaron, al igual que las escaleras de la entrada se habían separado de la pared.[22]

Posteriormente, el 30 de agosto de 2022, la AAA comenzó el desfile de su prueba con el testimonio del Sr. Luis A. Heil Salgado

---

[17] *Íd.*, pág. 208.
[18] *Íd.*, pág. 213.
[19] Apéndice del apelante, págs. 234-237.
[20] Transcripción del 29 de agosto de 2022, pág. 11.
[21] *Íd.*, págs. 38-39.
[22] *Íd.*, pág. 40.

(en adelante, "señor Heil Salgado"), y el perito geólogo Jesús A. Torres Ortiz (en adelante, "geólogo Torres Ortiz"), ambos empleados de la AAA.[23] En específico, el señor Heil Salgado declaró que, el 5 de octubre de 2008, se registraron dos (2) querella en la AAA sobre un salidero de agua en Toa Alta, una fue hecha por la señora Cubero Aponte y la otra por la señora Mattei Oyola. [24] Además, expresó que de sus sistemas surgió que la referida avería se reparó el día 7 de octubre de 2008.

Por su parte, el geólogo Torres Ortiz declaró que uno de los principales detonantes naturales de deslizamientos era el agua.[25] Indicó que algunos agravantes asociados a la presencia del ser humano pudiesen ser las carreteras, la construcción de estructuras, entre otras. Declaró que el área en controversia estaba ubicada en la formación San Sebastián, la cual estaba compuesta por materia caliza, por lo que el terreno era propenso a saturarse y a moverse cuando llovía, lo que podía provocar que estructuras colapsaran.[26] El geólogo Torres Ortiz declaró que, en junio del 2009, visitó el Lote Núm. 1, y que observó que dicha propiedad estaba inclinada, y que tenía grietas en las columnas, el piso, y las paredes.[27] Además, declaró que observó cicatrices, o grietas de tensión, en la Carretera Núm. 159, típicas de deslizamientos rotacionales o de hundimiento y que coincidían con la ubicación de la aludida tubería.[28] El geólogo Torres Ortiz declaró que, según el United States Geological Survey (en adelante, "USGS"), en el área del Lago La Plata cayeron 13.05 pulgadas de lluvia, durante los días del 1 de septiembre de 2008 hasta el 8 de octubre de 2008. Particularmente, mencionó que,

---

[23] Apéndice del apelante, págs. 239-240.
[24] Transcripción del 30 de agosto de 2022, pág. 37.
[25] *Íd.*, pág. 116.
[26] *Íd.*, págs. 135-137.
[27] *Íd.*, pág. 149.
[28] *Íd.*, pág.178.

según la USGS, el 6 de octubre de 2008 fue el punto más alto de la precipitación.[29]

El geólogo Torres Ortiz continuó declarando que los componentes de arcilla expansiva que tenía la formación San Sebastián hacían que el terreno fuese propenso a moverse, y que los cortes hechos en el área para establecer estructuras, así como el peso y las vibraciones de los carros que transcurren por la carretera en controversia, podían provocar el hundimiento en el terreno.[30] Testificó que, el 6 de octubre de 2008, ocurrió un evento en el cual llovió casi dos (2) pulgadas en el sector, lo cual detonó el deslizamiento que ocasionó la rotura de la tubería.[31]

Durante las vistas del 31 de agosto de 2022 y el 1 de septiembre de 2022, continuó el desfile de prueba de la AAA.[32] En específico, testificó el perito ingeniero geotécnico, el Dr. Carlos Rodríguez Pérez (en adelante, "doctor Rodríguez Pérez"), quien declaró que visitó el área en controversia de cuatro (4) a cinco (5) veces.[33] Testificó que, durante sus visitas, observó rasgos típicos de un deslizamiento o inestabilidad en el terreno en la Carretera Núm. 159, al igual que no vio que hubiese medidas de mitigación en los terrenos en controversia.[34] Además, indicó que, para hacer su investigación, revisó los informes del geólogo Torres Ortiz, el informe de exploración de subsuelo hecho por el ingeniero Carlos A. Ortiz Suárez, el informe hecho por el ingeniero Órban Mendoza, y el informe hecho por el ingeniero García Vincenty. Incluso, declaró que al comparar sus hallazgos con los del geólogo Torres Ortiz, concluyó que el área en controversia ha experimentado problemas de inestabilidad desde antes del año 1930.[35]

---

[29] *Íd.*, pág. 194.
[30] *Íd.*, págs. 220-222.
[31] *Íd.*, pág. 244.
[32] Apéndice del apelante, págs. 246-248 y págs. 250-251.
[33] Transcripción del 31 de agosto de 2022, pág. 256.
[34] *Íd.*, págs. 256-257.
[35] *Íd.*, pág. 82.

Finalmente, el 1 de noviembre de 2022, culminó el juicio en su fondo con el testimonio del ingeniero estructural Emiliano H. Ruiz Pla (en adelante, "ingeniero Ruiz Pla").[36] En resumen, este declaró que visitó el Lote Núm. 1 y 2 en dos (2) ocasiones, así como que revisó los informes preparados por el ingeniero Orbán Mendoza, el ingeniero García Vincenty, y el doctor Rodríguez Pérez. Sin embargo, aclaró que, solo levantó inventario de las alegaciones de índole estructural sobre el Lote Núm. 2, ya que era evidente que el Lote Núm. 1 era pérdida total.[37] Testificó que no observó señales de la alegada socavación durante su visita.[38] Señaló que el Lote Núm. 1 mostraba tener una rotación de izquierda a derecha, al igual que tenía elementos verticales muy inclinados, típicos de una falla rotacional del suelo.[39] Por otro lado, indicó que el Lote Núm. 2 tenía una rotación contraria, pero significativamente menor, a la del Lote Núm. 1. Además, declaró que el Lote Núm. 2 mostraba manifestaciones típicas de la inestabilidad del suelo, así como de vicios de construcción.[40]

Así las cosas, el 27 de agosto de 2024, el Tribunal de Primera Instancia emitió la *Sentencia* apelada.[41] En esta, el Foro Primario concluyó que, a pesar de que surgía de la prueba pericial que la composición del subsuelo del área en controversia era propensa a deslizamientos y que la saturación del terreno con la lluvia podía provocar los deslizamientos, la AAA no probó que hubiese llovido el día en que comenzó a notarse la humedad, las grietas y la filtración por la Carretera Núm. 159 y las propiedades en controversia. Asimismo, determinó que se probó que la filtración del agua comenzó a notarse el 5 de octubre de 2008, que la rotura de la

---

[36] Apéndice del apelante, págs. 254-256.
[37] Transcripción del 1 de noviembre de 2022, pág.13.
[38] *Íd.*, págs. 34-43.
[39] *Íd.*, pág. 45.
[40] *Íd.*, 47.
[41] Apéndice del apelante, págs. 258-279.

referida tubería ocurrió el 6 de octubre de 2008, y que esta se agravó el 7 de octubre de 2008. Por ello, determinó que el deslizamiento en las propiedades ocurrió con posterioridad a la rotura del tubo. Además, esbozó se demostró que, independientemente de que la presencia humana podía agravar los deslizamientos, esta ya existía previo a la rotura y no había ocurrido un deslizamiento.

De este modo, el Foro de Instancia concluyó que fue la descarga de agua de la tubería averiada lo que ocasionó el deslizamiento que afectó las estructuras. Sostuvo que, si hubiese sido producto de las construcciones en esa zona, los deslizamientos hubiesen continuado ocurriendo. Aunque se demostró que el terreno era susceptible a deslizamientos, el Foro *a quo* determinó que la AAA no mitigó los daños y fue negligente, específicamente cuando era previsible que, ante la falta de diligencia de esta, ocurriera un movimiento de tierra con la rotura de una tubería que se demoró tres (3) días en repararse. Asimismo, resaltó que ninguno de los peritos pudo concluir que el deslizamiento ocurrió previo a la rotura de la tubería. Sin embargo, señaló que los testigos de la parte demandante, además de haber presenciado los hechos, declararon que tres (3) día después de la rotura notaron los daños de las estructuras.

No obstante, a pesar de concluir que las propiedades sufrieron daños como consecuencia de la negligencia de la AAA, razonó que no procedía la concesión de una indemnización por estos, ya que no se probó que los demandantes fueran los propietarios de los Lotes en controversia, Sin embargo, razonó que los daños morales eran personalísimos y no estaban atados a la titularidad. Por ello, determinó que estos habían sufrido daños emocionales como consecuencia de la negligencia de la AAA. En específico, indicó que, debido a que el Lote Núm. 1 fue pérdida total, las angustias mentales de la señora Cubero Aponte fueron mayores, por lo que le adjudicó

una indemnización de veinticinco mil dólares ($25,000.00) por concepto de sufrimientos y angustias mentales. Asimismo, al razonar que estos pudieron continuar viviendo en la propiedad y llevar a cabo mejoras, le otorgó a la señora Mattei y al señor Santiago López una cantidad ascendente a quince mil dólares ($15,000.00) a cada uno por concepto de sufrimientos y angustias mentales.

Inconforme, y tras denegada una solicitud de *Reconsideración,* el 2 de diciembre de 2024, el apelante presentó un recurso de *Apelación* ante nos, mediante la cual señaló la comisión de los siguientes errores:

1. Erró el TPI al determinar que lo que causó daños a las propiedades inmuebles de los demandantes fue como consecuencia de la rotura del tubo de la AAA, cuando los demandantes no pudieron demostrar que fue lo que causó los daños a la parte apelada y su propio perito Ing[.] Marcus García declaró que no sabía qué era lo que había causado los daños a la parte apelada.
2. Erró el TPI al no considerar en su Sentencia que el informe pericial geotécnico del perito de la AAA, Dr. Carlos Rodríguez Pérez, fue estipulado por la parte apelada y fue admitido como Exhíbit Conjunto #10 y establece que el agua de la AAA <u>no</u> es responsable por los referidos daños.
3. Erró el TPI al no considerar en su Sentencia que todos los peritos de la AAA coligieron en que el evento de 6 de octubre de 2008 ocurrió debido a que el terreno de la zona es de alta permeabilidad que hace que el mismo sea más susceptible a erosión y, por lo tanto, a tener problemas de inestabilidad y que los eventos de precipitación en el área fue el factor detonante para que el deslizamiento ya existente se activara.
4. Erró el TPI al no considerar en su Sentencia que el perito de la parte apelada Ing[.] Marcus García tuvo que admitir que está totalmente de acuerdo con que los detonantes de los deslizamientos son los que se informan en los distintos informes periciales de la AAA, entre ellos la precipitación.
5. Erró el TPI al no reconsiderar el que el informe pericial preparado por el Ing[.] Carlos Ortiz Suárez (QEPD), ingeniero geotécnico, que fue marcado por este Honorable Tribunal como Prueba Ofrecida y No Admitida de la AAA, Id[.] 1 de la AAA no sea admitido como Exhibit 6 de la AAA, cuando dicho informe pericial forma parte del informe pericial del Ing Orban Mendoza, identificado como Exhíbit 4 de la AAA; analizado por el Ing[.] Marcos García, perito de la parte demandante y discutido en el informe pericial geotécnico del Dr[.] Carlos Rodríguez Pérez, Exhíbit Conjunto 10.

6. Erró el TPI al no considerar en su Sentencia que de los Exhíbits Conjuntos 6 y 7, que la Junta de Planificación y ARPE el permiso de construcción a la codemandada Gloria Esther Morales Miranda estaba <u>condicionado a que esta realizara un estudio geotécnico en el lugar porque la</u> Junta de Planificación había determinado que los terrenos objeto de consulta para el desarrollo de los solares residenciales son susceptibles de deslizamientos, y que condicionó el desarrollo de los terrenos entre varios asuntos a que se proveyeran medidas de ingeniería, entiéndase, geotécnicas, adecuadas para mitigar la condición de deslizamiento de los terrenos.

7. Erró el TPI al no incluir en su Sentencia el testimonio del perito estructural de la la [sic] AAA, Ing[.] Emiliano Ruiz y no incluir en la Sentencia el informe pericial estructural de dicho perito, el cual fue admitido y macado [sic] como Exhíbit #5 de la AAA.

8. Erró el TPI al determinar adjudicar partidas económicas a los demandantes:
   a. Ruth F. Cubero Aponte, Lote 1, la suma de $25,000.00 por razón de alegadas angustias mentales;
   b. Lisa M Mattei y Juan Santiago López, Lote 2, la suma de $30,000.00 por angustias mentales, desglosados a razón de $15,000.00 cada uno.

Transcurrido el término dispuesto en la Regla 22 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, pág. 38, 215 DPR __ (2025), para que la señora Núñez López presentara su alegato en oposición al recurso de epígrafe, no compareció por lo que dimos por perfeccionado el recurso.

**-II-**

**A. Apreciación de la Prueba**

Sabido es que los foros apelativos tenemos la facultad de revisar en su totalidad las conclusiones de derecho que emita el Tribunal de Primera Instancia. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Sin embargo, como regla general, no debemos intervenir en las determinaciones de hechos que haga el Foro de Instancia. Cónsono con lo anterior, la Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2, dispone lo siguiente:

Las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciados para juzgar la credibilidad de las personas testigos.

De igual forma, ha sido reiterado en nuestro ordenamiento jurídico que se le debe dar gran deferencia al Foro de Instancia, ya que es quien está en mejor posición de evaluar y adjudicar la credibilidad de un testigo. *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 810 (2009); *Argüello v. Argüello*, 155 DPR 62, 79 (2001). Es el Tribunal de Primera Instancia quien tiene la oportunidad de apreciar los gestos, titubeos, contradicciones, manierismos, dudas, vacilaciones, entre otros elementos subjetivos, de los testigos que declaran en el pleito. *Argüello v. Argüello*, supra, págs. 78, citando a *Figueroa v. Am. Railroad Co.*, 64 DPR 335, 336 (1994).

Por ello, nuestro Tribunal Supremo ha sido enfático en que los tribunales apelativos debemos evitar intervenir con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza el Foro sentenciador, salvo que se demuestre que este incurrió en error manifiesto, pasión, prejuicio o parcialidad. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 917 (2016); *Dávila Nieves v. Meléndez Marín*, supra, pág. 771; *Ramírez Ferrer v. Conagra Foods PR*, supra, pág. 811; *Argüello v. Argüello*, supra págs. 78-79. Por tanto, nuestra intervención con la prueba testifical solo procederá cuando, al llevar a cabo un análisis integral de esta, "nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia". *Sucn. Rosado v. Acevedo Marrero*, supra, pág. 918. Por consiguiente, nuestra facultad de sustituir las determinaciones hechas por el Tribunal de Primera Instancia se limita a aquellas circunstancias en las que no exista base suficiente para apoyar las mismas a la luz de la prueba admitida. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779

(2022); *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 794 (2020).

De este modo, una parte que impugne las determinaciones de hechos emitidas por el Foro Primario debe identificar el error manifiesto o fundamentar la existencia de pasión, prejuicio o parcialidad. *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009). Dicha parte deberá "sustentar sus alegaciones con evidencia suficiente, pues estas no deben convertirse en un instrumento para ejercer presión contra el Tribunal de Primera Instancia". *Dávila Nieves v. Meléndez Marín,* supra, pág. 775. De esta forma, el foro apelativo podrá evaluar si el juzgador de los hechos cumplió con su rol de adjudicar la controversia conforme a derecho y de manera imparcial. *Íd.*, pág. 777.

Particularmente, cuando se trate de prueba pericial, ningún tribunal está obligado a coincidir con las conclusiones de un perito, independientemente de que esta sea técnicamente correcta. *Sucn. Rosado v. Acevedo Marrero*, supra, pág. 918. Por tanto, todo tribunal tiene discreción de adoptar su propio criterio en la apreciación de dicha prueba. *Íd.*, citando a *Zambrana v. Hospital Santo Asilo de Damas*, 109 DPR 517, 522 (1980) y a *Prieto v. Maryland Casualty* Co., 98 DPR 594, 623 (1965). Asimismo, los foros apelativos se encontrarán en la igual posición que el foro de instancia para evaluar la prueba pericial. *Sucn. Rosado v. Acevedo Marrero*, supra, pág. 918; *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

**B. Daños Civiles Extracontractuales**

La reclamación por daños civiles extracontractuales tiene su origen en el Artículo 1802 del Código Civil de Puerto Rico de 1930,

31 LPRA ant. sec. 5141.[42] En lo pertinente, el referido estatuto dispone que "[e]l que por acción y omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado [...]". *Íd.* De este modo, la parte que promueve una causa de acción bajo los preceptos de este artículo debe establecer: "(1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión del demandado, y (3) el acto u omisión cual tiene que se ser culposo o negligente". *Pérez et al. v. Lares Medical et al.,* 207 DPR 965, 976 (2021); *López v. Porrata Doria,* 169 DPR 135, 150 (2006).

En cuanto a la culpa o negligencia que debe probarse, se considera que esta comprende la falta del debido cuidado, lo cual se compone de "no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias". *Pérez et al. v. Lares Medical et al.,* supra, pág. 977; *López v. Porrata Doria,* supra, pág. 151, citando a *Toro Aponte v. E.L.A.,* 142 DPR 464, 473 (1997). De este modo, nuestro ordenamiento jurídico considera que el criterio central que se debe evaluar al adjudicar responsabilidad por culpa o negligencia es el deber de previsión. *Cruz Flores et al. v. Hosp. Ryder et al.,* 210 DPR 465, 484 (2022). "Para determinar si el resultado era razonablemente previsible es preciso acudir a la figura [de la persona] prudente y razonable, que es aquella persona que actúa con el grado de cuidado, diligencia, vigilancia y precaución exigidos por las circunstancias". *Pons v. Engebretson,* 160 DPR 347, 355 (2003); *Monllor v. Soc. de Gananciales,* 138 DPR 600, 604 (1995). No obstante, el deber de previsión no se extiende a todo riesgo posible, sino que debe evaluarse si era posible anticipar las

---

[42] Advertimos que el Artículo 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 5141, fue derogado por el Artículo 1536 del Código Civil de 2020, 31 LPRA sec. 10801. No obstante, por ser el estatuto vigente al momento de los hechos en controversia, haremos referencia a lo dispuesto en el Código Civil del 1930.

consecuencias de una acción o inacción determinada. *Montalvo v. Cruz,* 144 DPR 748, 756 (1998).

**C. Valoración de Daños**

Es sabido que la tarea de valorar los daños es una que resulta difícil y angustiosa, ya que no hay una fórmula matemática que conceda un resultado con el cual todas las partes estén satisfechas. *Vázquez Figueroa v. E.L.A.*, 172 DPR 150, 154 (2007); *Nieves Cruz v. U.P.R.*, 151 DPR 150, 169-170 (2000); *Blás v. Hosp. Guadalupe*, 146 DPR 267, 339 (1998). Por ello, permea una norma de abstención judicial de parte de los foros apelativos, la cual se fundamenta en criterios de estabilidad y deferencia a los tribunales de instancia. *Vázquez Figueroa v. ELA,* supra, págs. 154-155; *Urrutia v. A.A.A.*, 103 DPR 643, 647-648 (1975). Asimismo, nuestro Tribunal Supremo ha reiterado que los tribunales apelativos no debemos intervenir con la cuantía concedida por el Foro Primario, salvo que esta sea una ridículamente baja o exageradamente alta. *Vázquez Figueroa v. ELA,* supra, pág. 155. Esto se debe a que se considera que los "jueces de instancia están en mejor posición que los tribunales apelativos para hacer esta evaluación, ya que tienen contacto directo con la prueba presentada". *Vázquez Figueroa v. ELA,* supra, pág. 155; *Blás v. Hosp. Guadalupe*, supra, pág. 339.

Ha sido reconocido que la valorización de daños implica cierto grado de especulación, lo cual lleva al Juzgador de los hechos a aplicar el sentido de justicia y de conciencia humana al hacer su determinación. *Ramírez Ferrer v. Conagra Foods PR*, supra, pág. 819. Dicha valoración del daño debe ser una proporcional entre el daño causado y la indemnización otorgada, conforme a los hechos y circunstancias particulares del caso, pues, de lo contrario, habrá base para su modificación. *Blás v. Hosp. Guadalupe*, supra, pág. 339.

En virtud de lo anterior, para poder evaluar la razonabilidad de la compensación concedida por el Foro Primario, debemos evaluar la prueba desfilada ante dicho foro, al igual que las indemnizaciones concedidas en casos similares resueltos anteriormente, los cuales servirán de punto de partida. *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, 770 (2023); *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 491 (2016); *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, 179 DPR 774, 785 (2010). Es por esto que el Foro de Instancia debe detallar en su dictamen los casos que utilice como referencia para estimar la compensación, al igual que cómo dichas referencias se ajustan al caso particular que tiene ante su consideración. *Santiago Montañez v. Fresenius Medical*, supra, pág. 493. No obstante, ello implica que estos casos parecidos compongan precedentes obligatorios, especialmente cuando no existen dos (2) casos exactamente iguales. *Sucn. Mena Pamias et al. v. Meléndez et al.*, supra, pág. 771, citando a *Santiago Montañez v. Fresenius Medical*, supra, pág. 491.

A su vez, una parte que pretenda impugnar la indemnización concedida por el Tribunal de Primera Instancia tendrá el peso de la prueba para demostrar que las circunstancias así lo justifican. *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 203 (2013); *Rivera v. Tiendas Pitusa, Inc.*, 148 DPR 695, 700 (1999).

**-III-**

La AAA acudió ante nos y señaló la comisión de ocho (8) errores por parte del Tribunal de Primera Instancia. Por estar relacionados entre sí, discutiremos los primeros siete (7) errores en conjunto. En síntesis, la AAA planteó que los apelados no demostraron que la rotura de la referida tubería hubiese causado los daños en el Lote Núm. 1 y 2. Sostuvo que, tanto el perito de los apelados, como los presentados por la AAA, coincidieron en que los

eventos de precipitación en el área y la inestabilidad del terreno fueron los detonantes para el deslizamiento que provocó la rotura de la tubería, por lo que la apelante no era el responsable de los daños alegados. Además, arguyó que el Foro de Instancia incidió al no tomar en consideración lo declarado por el ingeniero Ruiz Pla en la *Sentencia* apelada, así como que no se habían hecho los estudios geotécnicos solicitados por la Junta de Planificación y ARPE al desarrollar las construcciones en el área.

Tal cual esbozado en el entendido doctrinal, la parte que presenta una acción por daños y perjuicios debe probar la existencia de un daño real, la acción u omisión culposa o negligente del demandado, y el nexo causal entre estos. Ante la falta del debido cuidado que una persona prudente y razonable ejercería en la misma circunstancia, estaríamos ante un acto u omisión negligente. Por ello, se requiere evaluar si el resultado de esta acción u omisión era razonablemente previsible.

En el caso ante nos, surge del expediente que los peritos presentados por ambas partes coincidieron en que la USGS informó que el 6 de octubre de 2008 llovió en el área en controversia. Por ello, el apelante adujo que no era responsable, ya que sostuvo que esta lluvia fue lo que ocasionó el deslizamiento que averió la tubería. No obstante, surge claramente de la prueba que los apelados demostraron que la humedad que provenía de la Carretera Núm. 159 comenzó a notarse desde el 5 de octubre de 2008. Incluso, de la prueba presentada por el apelante, emana que el señor Heil Salgado, empleado de la AAA, declaró que el 5 de octubre de 2008 se presentaron las querellas reportando la avería de dicha tubería. Aun así, surge de la prueba que esta no fue reparada hasta el 7 de octubre de 2008. Es decir que, durante tres (3) días, los terrenos del Lote Núm. 1 y 2 continuaron siendo saturados por el agua que salía de la tubería. A pesar de que la AAA tenía conocimiento sobre que

la composición del terreno era susceptible a deslizamientos y que el agua podía ser un detonante para ello, la AAA se demoró en reparar la avería. Asimismo, aunque ninguno de los peritos pudo determinar a ciencia cierta si ocurrió primero la rotura de la tubería o el deslizamiento, todos coincidieron en que el agua podía empeorar la probabilidad de que ocurriera un deslizamiento.

Ahora bien, la AAA arguyó que, conforme a lo declarado por los peritos, la presencia humana, como las construcciones, la vibración de los carros, entre otros, también podía afectar la integridad del terreno. Igualmente, alegó que no se realizaron las pruebas geotécnicas previo a desarrollar las propiedades en el terreno en controversia. A pesar de que en su dictamen reconoció la veracidad de dicho argumento, el Foro Primario concluyó que ello no implicaba la ausencia de responsabilidad de la AAA de reparar la rotura de la tubería, ya que se probó que fue la demora de los apelantes lo ocasionó los daños en el Lote Núm. 1 y 2. Igualmente, el Foro de Instancia reconoció que se probó que el subsuelo se ha estado moviendo desde la antigüedad y que continuaría haciéndolo. Sin embargo, no es hasta que ocurre la rotura de la tubería en que las referidas propiedades reflejaron daños estructurales. Por consiguiente, razonó que, si estos hubiesen sido consecuencia de las fallas relacionadas a su construcción o a la inestabilidad del terreno, los daños hubiesen ocurrido antes.

Así, conforme al resumen doctrinal esbozado anteriormente, salvo que haya incurrido en error manifiesto, pasión, prejuicio, o parcialidad, nuestro ordenamiento jurídico invita a que los tribunales apelativos se abstengan de intervenir con la apreciación de la prueba del Tribunal de Primera Instancia. Esto se debe a que es el Foro de Instancia quien está en mejor posición de adjudicarle credibilidad a los testimonios vertidos en el pleito ante su consideración, pues tiene la oportunidad de evaluar el

comportamiento de los testigos. Únicamente procederá que esta Curia sustituya las determinaciones de hechos que hace el Tribunal de Primera Instancia cuando no exista en el expediente base suficiente para apoyarlas. No obstante, cuando se trata de prueba pericial, ningún tribunal está obligado a coincidir con las conclusiones de un perito.

De este modo, al evaluar la prueba presentada en el presente caso, no observamos que el Tribunal de Primera Instancia haya un incurrido en error manifiesto, pasión, prejuicio o parcialidad que amerite nuestra intervención con las determinaciones de hecho realizadas. Por el contrario, surge claramente del expediente que, en un dictamen bien fundamentado, el Foro *a quo* tomó en consideración, tanto la prueba testifical como la pericial que fue presentada por ambas partes. Ello, lo llevó a concluir que los daños de los apelados fueron producto de la negligencia de la AAA al haberse demorado tres (3) días en reparar la avería.

Por otro lado, en su octavo señalamiento de error, el apelante alegó que las partidas económicas concedidas por el Tribunal de Primera Instancia por concepto de las angustias mentales sufridas son excesivas. Habiendo evaluado los hechos del presente caso, así como el derecho aplicable, colegimos que el Foro Primario no cometió el error señalado.

Según el derecho aplicable a la controversia ante nos, salvo que las indemnizaciones concedidas resulten ridículamente bajas o excesivamente altas, debemos abstenernos de intervenir en la cuantía adjudicada por el Foro Primario como compensación. Surge del dictamen apelado que el Foro *a quo* tomó de punto de partida el caso *Ferran Rodríguez v. AAA*, KLAN201401243, para conferir la indemnización por las angustias mentales sufridas por los apelados. En el referido caso, el Tribunal de Primera Instancia concedió una indemnización de veinticinco mil dólares ($25,000.00) por concepto

de angustias mentales a los demandantes luego de que las propiedades de estos sufrieran daños por una avería de una tubería de la AAA que tardó día y medio en repararse.

En el caso ante nos, surge del expediente que la avería tardó tres (3) días en repararse, por lo que la constante saturación del suelo causó daños en las propiedades de los apelados. El Foro Primario consideró que, al no probarse que los apelados eran los propietarios de los inmuebles afectados, no procedía conceder una indemnización por los daños estructurales. No obstante, el Tribunal determinó que los apelados probaron los sufrimientos y angustias mentales que sobrellevaron como consecuencia de la negligencia de la AAA.

De este modo, razonó que, al haber sido declara pérdida total el Lote Núm. 1, los daños morales de la señora Cubero Aponte Debido fueron más severos que los de la señora Mattei Oyola y el señor Santiago López. Consecuentemente, le adjudicó veinticinco mil dólares ($25,000.00) a la señora Cubero Aponte, y quince mil dólares ($15,000.00) a cada uno de los otros dos apelados.

De la prueba presentada no surge que esta valoración de daños haya sido ridículamente baja o excesivamente alta para justificar nuestra intervención con dicha conclusión. Los apelantes tampoco nos pusieron en posición de concluir que esta era irrazonable. Por tanto, concluimos que el Foro de Instancia no abusó de su discreción al imponer la aludida cantidad, por lo que no se cometió el error señalado.

Así, luego de analizar la prueba documental, los testimonios vertidos en el juicio, y el derecho aplicable, concluimos que el Tribunal de Primera Instancia no cometió los errores señalados. Por tanto, confirmamos la *Sentencia* apelada.

**-IV-**

Por los fundamentos esbozados anteriormente, **confirmamos** la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones